## STATE

v.

## Oscar W. CASAS.

## No. 2003–641–C.A.

Supreme Court of Rhode Island.

June 22, 2006.

properly before the Court, and we will not address it.

Kelly A. McElroy, Esq., for Plaintiff.

William J. Murphy, Esq., for Defendant.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

GOLDBERG, Justice for the Court.

The defendant, Oscar W. Casas (Casas or defendant), appeals from a judgment of conviction for possession of one ounce to one kilogram of cocaine and possession with the intent to deliver cocaine. The defendant argues that the trial justice erred by denying his motion to suppress because: (1) the police did not have a reasonable, articulable suspicion as a basis for stopping his automobile; (2) he was illegally detained in violation of his constitutional rights; (3) he was subjected to a custodial interrogation without the benefit of *Miranda* warnings; and (4) he signed a consent-to-search form as the result of police coercion. For the reasons stated herein, we reverse the conviction and vacate the judgment of the Superior Court.

### Facts and Travel

Lieutenant David Neill (Lt.Neill) of the Rhode Island State Police testified that he became aware of Casas in 1993, in connection with drug trafficking investigations. According to Lt. Neill, he received information over the next several years concerning defendant's purported drug dealing; and, in 1999, a first-time informant, not proven reliable, advised Lt. Neill that defendant was using a house at 224 Amherst Street in Providence that was owned by defendant's wife and a friend "to hold, store, conceal and distribute * * * cocaine." As a result of this information, Neill testified that he periodically conducted surveillance, without success, at the Amherst Street address.

In January 2001, a second informant, considered to be reliable, told Lt. Neill that although he never actually had seen any drugs at the Amherst Street address, Casas was using a room in the basement to store cocaine. Lieutenant Neill also

learned that defendant lived with his wife, Dora, at 262 Fruit Hill Avenue in North Providence and that he was driving a green GMC pickup truck. This informant also disclosed that defendant went to Amherst Street only to store and distribute cocaine. Lieutenant Neill testified that he conducted surveillance at the Amherst Street address "maybe three to five times" ranging from thirty minutes to "maybe two hours long." The defendant never was there.

On February 7, 2001, Lt. Neill spoke with Agent Richard Deasy (Agent Deasy) of the Immigration and Naturalization Service (INS), who told him that an INS informant who was considered reliable disclosed that a Columbian male, known only as "Oscar," was driving a green GMC pickup truck and using the Amherst Street address for cocaine trafficking. According to Agent Deasy's informant, the basement door at 224 Amherst Street was locked, defendant had the key, and the occupants of the three-story apartment building were not allowed to use the basement. This informant indicated that defendant "frequently responded to the Amherst Street address on Thursdays, Fridays, and Saturdays and Sundays for the purpose of distributing cocaine."

On February 14, 2001, through information provided by Lt. Neill, Agent Deasy's informant identified defendant as the person known as "Oscar" who allegedly was storing cocaine at 224 Amherst Street.

Lieutenant Neill testified that after receiving this information, he and other State Police detectives planned to set up a surveillance of the Amherst Street address. According to Lt. Neill, "at that time probable cause was weak, but there was very strong reasonable suspicion to believe Mr. Casas * * * had cocaine in that basement." [1]

Later that morning, Lt. Neill spoke with Agent Deasy's informant, who told him that Casas had arrived at 224 Amherst Street, but then had left again. Within a few minutes, defendant returned to the location, stayed a few minutes, and drove away in his truck. Lieutenant Neill ordered the detectives to stop the truck. On cross-examination, Lt. Neill admitted that the only purpose of the stop was to pursue a drug investigation.

The record discloses that Detectives Michael Winquist (Det. Winquist) and Joseph Philbin (Det. Philbin) stopped the truck at the intersection of Hyatt Street and Manton Avenue in Providence. Detective Winquist pulled his unmarked Ford Explorer directly in front of defendant's truck; the detectives left their vehicle, approached defendant and ordered him out of his vehicle. They conducted a pat-down search for weapons. [2] Lieutenant Neill arrived "within thirty seconds" and positioned his unmarked van to the rear of defendant's vehicle. According to Lt. Neill, at this point, defendant was in custody and not free to leave. [3] Lieutenant Neill testified

1. According to Lt. Neill, the probable cause quotient improved after defendant was observed arriving at the Amherst Street location and leaving after a brief period; however, he made no effort to obtain a search warrant.

2. The defendant testified that the officers approached his vehicle with their guns drawn; the officers testified that although their firearms were visible they never drew their weapons. The trial justice found the officers' testi-

mony credible and defendant's testimony not credible.

3. There is a dispute among the arresting officers about whether defendant's vehicle was "boxed in," such that defendant could not drive away without hitting the detectives' vehicle or Lt. Neill's van. Both Lt. Neill and Det. Philbin testified that Lt. Neill's vehicle was stopped two or three feet behind defendant's truck; Det. Philbin agreed that defendant was boxed in, and Det. Winquist testified

that he informed defendant that he was conducting a narcotics investigation and that he believed that defendant possessed cocaine. After defendant denied having cocaine on his person or at Amherst Street, Lt. Neill testified that he asked defendant for permission to search his vehicle, to which request he alleges defendant said, "Yes." The defendant's version of these events markedly differs from the officers' testimony. He testified that Lt. Neill searched him and that the other officers searched his truck without asking permission to do so.

Detective Winquist and Det. Philbin testified that the truck search took four to five minutes and was fruitless—no drugs, weapons or other contraband were found. It is undisputed that no contraband was found in the vehicle or on defendant's person; that he had a valid driver's license, had not committed any traffic infractions, was not cited for any equipment violations and was a legal resident of the United States. However, he was not released.

Both Det. Winquist and Det. Philbin testified that after the truck was searched Lt. Neill and defendant moved into Lt. Neill's van. The defendant was not placed in handcuffs. According to Lt. Neill, he invited defendant into the front seat of his van because the weather was cold. Lieutenant Neill testified that, drawing upon his experience in obtaining consent to search from persons suspected of distributing narcotics, "I always try to get a one-on-one situation to avoid" the suggestion "that there are four [or] five larger detectives or troopers around."

On cross-examination, Lt. Neill testified that although nothing was uncovered during the truck search and no one ever had seen narcotics at the Amherst Street loca-

tion, he told defendant that he knew about the cocaine at Amherst Street and urged him to take responsibility for it. Lieutenant Neill acknowledged that on the basis of his experience in drug investigations, when dealing with a Colombian male, "you want to hit home to him that they [*sic*] have to be macho" and "accept responsibility." Lieutenant Neill testified that,

> "Mr. Casas put his head down. He didn't look at me. In observing him there was a noticeable change. He became nervous, his hands were shaking. He looked up at me and said, 'You've been trying to get me for a long time, huh?' I replied, 'Yes.' "

After agreeing that he had been "trying to get [defendant] for a long time," Lieutenant Neill testified that he again told defendant that "I knew he had cocaine in the basement at that address; that the basement was owned by his wife Dora and his friend Hugo Sepuelveda. I advised him if that's his cocaine, he should assume responsibility for that cocaine."

Although defendant did not respond, and continued looking down, Lt. Neill presented him with a consent-to-search form, asked him about his ability to read the English language, and, when defendant advised him that he read Spanish, Lt. Neill filled in the Spanish portion of the form. Notwithstanding that he had not consented, or even been asked to consent to a search of the Amherst Street address, defendant was presented with a consent-to-search form, in Spanish, that was partially filled out by Lt. Neill.

According to Lt. Neill, after he handed the search form to defendant, "[defendant] looked at the form and then [defendant]

___

that defendant could not drive off without hitting his vehicle. In light of Lt. Neill's admission that defendant was detained and

was not free to leave, we need not address this dispute.

said, 'Okay, let's go.'" Lieutenant Neill testified that,

> "After that, when he consented, I told Detectives Winquist and Philbin he had consented to the search of the Amherst Street address. Because of the area I asked Mr. Casas if it was okay if one of the detectives drove his vehicle back to the Amherst Street address."

Everyone returned to Amherst Street. Detective Winquist drove his cruiser, Det. Philbin drove defendant's truck, and defendant remained in the van with Lt. Neill. The defendant signed the consent-to-search form at 224 Amherst Street. The defendant was not advised of his *Miranda* rights nor was he informed that he could refuse to consent to the search.

Meanwhile, a phalanx of law enforcement officers was assembled at 224 Amherst Street waiting to search the premises: Agent Deasy and another agent from INS, State Police Det. Kevin Hawkins, and Providence Police Det. Jack Whalen. They were joined by Lt. Neill, Det. Winquist, and Det. Philbin for a total of seven officers. A large amount of cocaine was found in a locked room in the basement that defendant opened by unlocking the door and removing a pin that was in the door frame. The cocaine was seized, and Lt. Neill placed defendant under arrest and advised him of his *Miranda* rights.

The defendant denied having drugs or money at his home on Fruit Hill Avenue in North Providence. According to Lt. Neill, when he asked for permission to search his home, defendant "said that it would be okay." The defendant was placed in handcuffs and driven to his North Providence home. However, when they arrived, defendant refused to sign the consent-to-search form until he spoke with his attorney. Lieutenant Neill was undaunted,

however, not viewing that statement as a request for counsel; he also did not believe that defendant had withdrawn his prior consent. Because defendant "had already given verbal consent to go to that location" and never indicated that he did not want the officers to conduct the search, seven officers entered defendant's home without a warrant and, in the presence of his four-year-old son and other family members, conducted a search.

Lieutenant Neill testified that defendant directed the officers to a wall safe in the bedroom, and defendant unlocked the safe. The officers removed $37,599 in United States currency from the safe.[4] The defendant was charged with possession of an enumerated quantity of cocaine in violation of G.L.1956 §§ 21–28–2.08 and 21–28–4.01.1 and possession of cocaine with intent to deliver in violation of §§ 21–28–2.08, and 21–28–4.01(A)(2)(a), as amended by P.L.1995, ch. 370, art. 40, § 57. The defendant entered a plea of not guilty and moved to suppress all evidence seized in violation of his Fourth Amendment rights.

### Motion to Suppress

The trial justice denied defendant's motion to suppress the evidence seized in this case. First, he found that defendant lacked the requisite standing to challenge the search of his home or the Amherst Street location. Although the state has not raised the issue of defendant's standing on appeal and this issue is not properly before the Court, we nonetheless briefly shall address it.

The trial justice found that defendant had not sustained his burden of proof that he possessed a reasonable expectation of privacy in the areas searched or the cocaine or drug paraphernalia that was seized. The trial justice based his decision

---

4. This money was seized and is the subject of a separate forfeiture proceeding.

on defendant's failure to admit that the cocaine and cash were his and the fact that his wife owned the Amherst Street building and that tenants occupied it. Although he found that defendant collected the rents and made repairs, the trial justice refused to find standing because "defendant's wife was never called to testify as to what relationship, if any, she had with this defendant as far as the premises" were concerned.

Furthermore, although defendant had the key to the small room in the Amherst Street cellar and was able to open the door by removing a pin from the door frame, the trial justice noted that "there was no testimony by Mr. Casas that he had the only key." The trial justice found that defendant failed to prove that "he had the ability to control or exclude other[s'] use of this particular area where the cocaine was found."

Next, the trial justice concluded that defendant failed to show that he possessed a reasonable expectation of privacy in his Fruit Hill Avenue home or in the money that was seized from his bedroom safe. The trial justice found that he did not have exclusive access or control of the bedroom safe and failed to admit that the money was his. Further, because defendant held "blue collar jobs" and did not present evidence that this money came from his work or employment, the trial justice found that he failed to establish ownership. He declared that "[i]t could be his wife's money" or "his sister-in-law's money[,]" or even his children's money.

Despite his finding on standing, the trial justice reached the Fourth Amendment issues in this case. He found that the initial vehicle stop was proper and that the various searches and seizures were consensual.

Citing *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the trial justice correctly found that the validity of the automobile stop in this case turns on whether the police officers had a reasonable and articulable suspicion that the defendant is engaged in some type of illegal activity. The trial justice recounted Lt. Neill's testimony that he learned through informants that defendant stored cocaine at Amherst Street and was there for brief periods on Thursdays, Fridays, Saturdays and Sundays. Based on this information, the trial justice was satisfied that Lt. Neill drew a reasonable inference that defendant "was there to make deliveries using his truck." The trial justice declared that the initial stop was proper and that defendant consented to each search.

The trial justice cited *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996), and held that "the Fourth Amendment does not require that a lawfully seized defendant be advised that he is free to go before the defendant's consent to search will be recognized as voluntary." Although no *Miranda* warnings were given, the trial justice held that *Miranda* rights are not a prerequisite to voluntary consent and were not necessary because defendant was not subjected to a custodial interrogation.[5]

Notwithstanding that Lt. Neill, Det. Winquist and Det. Philbin testified that defendant was not free to leave and that if he had attempted to do so they would have stopped him, the trial justice found that defendant was not in custody until he was handcuffed while in the basement at Amherst Street.

Although he found that the initial vehicle stop was proper, the trial justice failed to

---

**5.** We note that defendant has not challenged the admissibility of any statements made to members of the Rhode Island State Police, but has raised the failure to provide *Miranda* warnings as evidence that his consent to search was not voluntary.

address whether defendant's continued detention was constitutionally permissible or whether the consent to search Amherst Street was obtained by exploitation of an illegal detention.

A jury was impaneled in this case, but a mistrial was declared because of prejudicial remarks in the prosecution's opening statement. The defendant's motion to dismiss on double jeopardy was denied and this Court affirmed. *State v. Casas*, 792 A.2d 737 (R.I.2002). The case then proceeded to a jury-waived trial in Superior Court on a stipulated set of facts. On July 23, 2002, the trial justice found defendant guilty, and he was sentenced to fifteen years at the Adult Correctional Institutions, eight to serve, seven years suspended, and seven years probation. The defendant appealed.

### Standard of Review

■ When confronted with a decision denying a motion to suppress evidence, the Supreme Court accords deference to a trial justice's findings of historical fact. *State v. Aponte*, 800 A.2d 420, 424 (R.I. 2002). However, when conducting the review, we are required to make "an independent examination of the record to determine if [the defendant's] rights have been violated." *State v. Abdullah*, 730 A.2d 1074, 1077 (R.I.1999) (quoting *In re John N.*, 463 A.2d 174, 176 (R.I.1983)). We conduct a *de novo* review of the record to determine the existence or nonexistence of a reasonable articulable suspicion justifying an automobile stop. *State v. Milette*, 727 A.2d 1236, 1239 (R.I.1999). Although we accord deference to the trial justice's findings of historical fact, *State v. Foster*, 842 A.2d 1047, 1050 (R.I.2004); *Powers v. State*, 734 A.2d 508, 514 (R.I.1999), we will not hesitate to overturn those findings if the trial justice overlooked or misconceived material evidence or otherwise clearly was wrong and violated a defen-

dant's constitutional rights. *Aponte*, 800 A.2d at 424.

### I

### Standing

In relying on this Court's decision in *State v. Verrecchia*, 766 A.2d 377 (R.I. 2001), the trial justice found that defendant failed to establish a reasonable expectation of privacy in the premises at 224 Amherst Street or in his home. The trial justice based this finding on defendant's failure to admit that the cocaine and the money were his and on the fact that defendant's wife owned the Amherst Street location, which tenants occupied. Although the state has conceded this issue, we shall briefly discuss defendant's reasonable expectation of privacy with respect to 224 Amherst Street and the bedroom of his own home. We are of the opinion that the trial justice overlooked and misconceived the evidence and clearly was wrong.

■ This Court has held that "[t]he Fourth Amendment protects people, not places." *State v. Milette*, 702 A.2d 1165, 1166 (R.I.1997) (citing *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Therefore, "[b]ecause Fourth Amendment rights are personal," we examine the facts of a case to determine whether the defendant had a legitimate expectation of privacy in the premises searched. *Id.* (citing *Rakas v. Illinois*, 439 U.S. 128, 138–48, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). In performing this inquiry, we are mindful that the defendant bears the burden of proving that he had an objectively reasonable expectation of privacy by demonstrating a sufficiently close connection with the premises searched. *Id.* at 1166–67 (citing *United States v. Sanchez*, 943 F.2d 110, 113 (1st Cir.1991)). In evaluating the reasonableness of privacy expectations, "no single

factor invariably will be determinative." *Rakas,* 439 U.S. at 152, 99 S.Ct. 421 (Powell, J. concurring). Thus, we consider a number of factors, including "whether the suspect possessed or owned the area searched or the property seized; his or her prior use of the area searched or the property seized; the person's ability to control or exclude others' use of the property; and the person's legitimate presence in the area searched." *State v. Linde,* 876 A.2d 1115, 1127 (R.I.2005) (quoting *Verrecchia,* 766 A.2d at 382).

 To challenge a search or seizure, a criminal defendant is not required to admit that he owns the drugs or contraband that were seized. An accused may assert standing to challenge a seizure of contraband without admitting ownership. In *Jones v. United States,* 362 U.S. 257, 262–67, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), the United States Supreme Court laid to rest the notion that in a challenge to the seizure of property, the possession of which is unlawful, a defendant must admit that he or she owns the contraband. Otherwise, the fact of "possession both convicts and confers standing," and the Court refused to "permit the Government to have the advantage of contradictory positions as a basis for conviction."[6] *Id.* at 263, 80 S.Ct. 725.

 In *Rakas,* 439 U.S. at 149–50 n. 17, 99 S.Ct. 421, the United States Su-

preme Court held that " 'arcane distinctions developed in property * * * law * * * ought not to control.' " Thus, "legal possession of a seized good is not a proxy for determining whether the owner had a Fourth Amendment interest, for it does not invariably represent the protected Fourth Amendment interest." *United States v. Salvucci,* 448 U.S. 83, 91, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). Instead, property ownership is one factor that Courts should consider to determine whether a defendant's Fourth Amendment rights have been violated, but it is "neither the beginning nor the end" of the examination. *Id.* Thus, "[w]e simply decline to use [exclusive] possession of a seized good as a substitute for a factual finding that the owner of the good had a legitimate expectation of privacy in the area searched." *Id.* at 92, 100 S.Ct. 2547.

 In this case, Casas had a reasonable expectation of privacy with respect to both 224 Amherst Street and his home. The evidence disclosed that defendant's wife was an owner of the Amherst Street building, and defendant collected rents and made repairs. He controlled the room in the basement and excluded others from this area. He had a key to the door in the basement, but to open the door defendant reached inside and removed a pin from the door frame. The trial justice overlooked this evidence.

---

**6.** The findings in this case mirror the "Hand Dilemma"—a rule that was articulated by the venerable jurist, Learned Hand in *Connolly v. Medalie,* 58 F.2d 629, 630 (2nd Cir.1932): "Men may wince at admitting that they were the owners, or in possession, of contraband property; may wish at once to secure the remedies of a possessor, and avoid the perils of the part; but equivocation will not serve. If they come as victims, they must take on that role, with enough detail to cast them without question. The petitioners at bar shrank from that predica-

ment; but they were obliged to choose one horn of the dilemma."
This quandary was consigned to history by the United States Supreme Court in *Jones v. United States,* 362 U.S. 257, 262–67, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) and *Simmons v. United States,* 390 U.S. 377, 389–94, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), in which the Court held that testimony given by a defendant in support of a motion to suppress cannot be admitted as evidence of his guilt at trial.

■ Further, the trial justice's finding that defendant lacked standing to challenge a search of his home and his bedroom simply was wrong. One's expectation of privacy must be reasonable, not exclusive. We fail to see how this defendant could not expect that he could exclude the police from entering his home and demanding access to a safe in his bedroom.

Thus, based on our *de novo* review, we are satisfied that defendant had a legitimate expectation of privacy in the premises searched, and the trial justice's ruling clearly was erroneous.

## II

### Search and Seizure

There were three warrantless searches in this case, each purportedly based on the defendant's consent. Only two proved fruitful. The search of defendant's vehicle failed to produce any incriminatory evidence, and we need not reach the validity of the consent to search the vehicle. We shall address the vehicle stop and the search of 224 Amherst Street and defendant's home.

### a. The Stop

■ "The Fourth Amendment applies to seizures of the person, including brief investigatory stops" of a suspected criminal's vehicle. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). To be valid, an investigatory stop of a person or vehicle must be based on "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Id.* The police "must have 'a reasonable suspicion based on specific and articulable facts that the person detained is engaged in criminal activity.'" *State v. Keohane*, 814 A.2d 327, 330 (R.I.2003) (quoting *Abdullah*, 730 A.2d at 1076). To determine whether the suspicions of a police officer "are sufficiently

reasonable to justify an investigatory stop, the Court must take into account the totality of the circumstances." *Id.* (citing *Cortez*, 449 U.S. at 417, 101 S.Ct. 690). We thus are called upon to examine all of "the facts and circumstances available to the officer at the time of the search." *Milette*, 727 A.2d at 1240.

■ Various factors contribute to a finding of reasonable suspicion of criminal activity, and these circumstances must be evaluated through the eyes of a trained police officer. *State v. DeMasi*, 448 A.2d 1210, 1212 (R.I.1982) (citing *Cortez*, 449 U.S. at 419, 101 S.Ct. 690). Although these considerations include "the personal knowledge and experience of the police officer," *Abdullah*, 730 A.2d at 1077, the officer's motivation will not invalidate a stop that was based on probable cause or articulable suspicion. *Whren v. United States*, 517 U.S. 806, 812, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). The subjective intentions of the police officers play no role in a Fourth Amendment inquiry as long as the factors articulated by the officer, when viewed objectively, justify the officer's actions. *Robinette*, 519 U.S. at 38, 117 S.Ct. 417; *Whren*, 517 U.S. at 813–14, 116 S.Ct. 1769. Thus, the constitutional reasonableness of a vehicle stop does not hinge on "the actual motivations of [the] individual officers" involved. *Whren*, 517 U.S. at 813, 116 S.Ct. 1769.

■ However, once a vehicle has been halted on the highway, the driver and passengers have been seized for Fourth Amendment purposes and are subject to the authority of the police officer. *United States v. Sowers*, 136 F.3d 24, 27 (1st Cir.1998). A stop that was lawful at its inception may be of such nature or duration as to become a *de facto* arrest for which probable cause must be established. *See Dunaway v. New York*, 442 U.S. 200,

212, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (holding that detention of defendant was indistinguishable from a traditional arrest).

In conducting *de novo* review of the record in this case, we have concerns about the initial stop of defendant's vehicle and whether it comported with our Fourth Amendment jurisprudence. The testimony discloses that little, if any, informant information was verified by the police, and Neill had no information that defendant used his vehicle to transport or deliver cocaine.

We contrast this case with our holding in *Keohane,* 814 A.2d at 330, in which we upheld an automobile stop based on specific and articulable facts that the defendant was engaged in criminal activity. In *Keohane,* Woonsocket police detectives received an anonymous tip that defendant "would be traveling to Providence in a van to purchase heroin that he intended to sell in Woonsocket." *Id.* at 328. The detectives began surveillance, followed defendant to Bucklin Street in Providence, observed Keohane and another man leave the van, approach a group of males on the street and engage in a brief exchange. The officers then observed the van driving erratically; they stopped the vehicle and the driver admitted that he and defendant had gone to Providence to buy heroin. The drugs were found in the vehicle. The trial justice denied defendant's motion to suppress, and we affirmed, concluding that "sufficiently corroborated and detailed information may justify an investigatory stop" that began with an anonymous tip. *Id.* at 330. We based our decision on the fact that the police were able to confirm the reliability of the tip and "drew a reasonable inference from *verified information* and properly stopped Keohane to in-

vestigate their suspicions." *Id.* at 331 (emphasis added).

In the present case, the trial justice found that the stop was justified based on a reasonable inference that defendant was using his truck to transport cocaine. However, little, if any, informant information was confirmed before the stop. Lieutenant Neill testified that he conducted four or five surveillances at 224 Amherst Street in the month preceding the arrest, but never saw defendant at that location. Moreover, Lt. Neill learned that defendant frequented 224 Amherst Street on Thursdays, Fridays and weekends. This arrest occurred on a Wednesday. The trial justice overlooked this evidence. There was no evidence that defendant had narcotics in his vehicle or made any drug deliveries to anyone. Finally, there was no evidence that these police officers were acting in a swiftly developing investigatory situation that arises during a valid traffic stop and justifies a longer-than-ordinary detention of the occupant of the vehicle. *See Sowers,* 136 F.3d at 27 (police are permitted to continue to pursue their mounting suspicions gleaned during the brief investigatory stop).

Notwithstanding the dubious justification for the truck stop, it is undisputed that the search of the truck proved fruitless, and we are not required to determine whether any fruits of the poisonous tree were seized from defendant's vehicle. We shall assume, arguendo, that the vehicle stop was justified.[7] The defendant's continued detention, however, is another matter.

#### b. The Detention

The trial justice found that defendant was not in police custody until he was arrested at 224 Amherst Street. We deem

---

7. We make this assumption mindful that, if contraband had been discovered in the vehi-

cle, the lawfulness of its seizure would be a much closer question.

this finding erroneous. The trial justice overlooked Lt. Neill's frank admission that after defendant was removed from his truck he was not free to leave and that, if he had attempted to flee, Lt. Neill would have stopped him. We are satisfied that once stopped and removed from his vehicle, defendant was detained.

■■■■ It is well settled that when the police temporarily detain a motorist for a traffic stop, "even if only for a brief period and for a limited purpose," this constitutes a seizure of the person "within the meaning of the [Fourth Amendment]." *Whren*, 517 U.S. at 809–10, 116 S.Ct. 1769 (citing *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *United States v. Martinez–Fuerte*, 428 U.S. 543, 556, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id.* at 810, 116 S.Ct. 1769. "[T]he ensuing investigation must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance, so as to be minimally intrusive of the individual's Fourth Amendment interests." *United States v. Glover*, 957 F.2d 1004, 1011 (2nd Cir.1992). A motor vehicle stop must be reasonable in purpose and duration. "If an investigative stop based on reasonable suspicion continues too long or becomes unreasonably intrusive, it will ripen into a *de facto* arrest that must be based on probable cause." *Id.*

■■■■ "The reasonableness inquiry is almost always fact specific." *Owens*, 167 F.3d at 748 (citing *United States v. Zapata*, 18 F.3d 971, 975 (1st Cir.1994)). There is no precise formula to evaluate whether an investigatory stop has turned into a *de facto* arrest; such a determination must be made based on the totality of the circumstances. *Zapata*, 18 F.3d at 975. Courts generally employ a two-prong test to evaluate the reasonableness of an investigatory stop. *Owens*, 167 F.3d at 748. We must determine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■■■■ With respect to the first inquiry, we have assumed that the stop was lawful. We now look to the police conduct *after* the stop and determine whether the officers' conduct was "reasonably responsive to the circumstances justifying the stop in the first place, as augmented by information gleaned by the officer during the stop." *Sowers*, 136 F.3d at 27. Based on the totality of the circumstances, this Court must determine whether "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Owens*, 167 F.3d at 749 (quoting *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)). Once the purpose of the stop has been accomplished, a police officer may not detain a suspect and "embark[ ] upon [an] expedition for evidence in the hope that something might turn up." *United States v. Babwah*, 972 F.2d 30, 34 (2nd Cir.1992) (quoting *Brown v. Illinois*, 422 U.S. 590, 605, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)). That is precisely what occurred in this case.

■■■■ Based on our *de novo* review of the evidence, we are of the opinion that the defendant's continued detention was unlawful and constituted a *de facto* arrest that was not based on probable cause.

Once the truck search concluded and failed to produce any incriminating evidence, the officers' right to detain defendant evaporated. We distinguish this case from a traffic stop based on probable cause. *See Florida v. Jimeno*, 500 U.S. 248, 249, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (defendant's car was stopped for traffic infraction). The defendant was not stopped for a moving or equipment violation; his vehicle was registered and he had a valid driver's license. The defendant was stopped and detained so that the police could search his truck and, we conclude, gain access to the basement of 224 Amherst Street without obtaining a warrant.

On cross-examination, Lt. Neill admitted that on February 14, 2001, he had formulated a plan to have defendant's vehicle stopped to pursue a narcotics investigation. While defendant was detained at Manton and Hyatt, Lt. Neill was urging defendant to accept responsibility for the cocaine. At the same time, officials from three law enforcement agencies were assembled at Amherst Street, waiting to search the premises. We are satisfied that the illegal detention in this case "had a quality of purposefulness," such that defendant was detained illegally so the officers could embark upon an expedition for evidence without obtaining a search warrant. *Brown*, 422 U.S. at 605, 95 S.Ct. 2254.

Our conclusion that the detention was illegal does not end the analysis. The search in this case purportedly was based on defendant's consent. Because consent can be valid notwithstanding an illegal detention, we shall examine whether that consent was sufficiently attenuated with respect to the illegal arrest as to be admissible. *See State v. Jennings*, 461 A.2d 361, 368 (R.I.1983) (evidence seized pursuant to consent obtained during an illegal arrest may be admissible "if the state can establish that the connection between the unlawful action and the [consent to search] has 'become so attenuated as to dissipate the taint' ").

### c. The Consent to Search

A search conducted "pursuant to a valid consent is constitutionally permissible." *State v. Hightower*, 661 A.2d 948, 960 (R.I.1995). "The state bears the burden of establishing that the 'consent to search [was] freely and voluntarily given.' " *State v. O'Dell*, 576 A.2d 425, 427 (R.I.1990) (quoting *State v. Beaumier*, 480 A.2d 1367, 1374 (R.I.1984)). This burden of proof is by a preponderance of the evidence. *Id.*

The validity of a defendant's consent to search can be tainted fatally by an illegal stop, detention or arrest. "Consent given during an illegal detention is presumptively invalid." *United States v. Cellitti*, 387 F.3d 618, 622 (7th Cir.2004). This Court has held that evidence obtained by exploitation of an illegal arrest must be excluded at trial as the fruit of the poisonous tree. *State v. Burns*, 431 A.2d 1199, 1205 (R.I.1981).

However, a defendant's consent can be deemed valid if it is sufficiently attenuated from the illegal police action "to dissipate the taint." *Wong Sun v. United States*, 371 U.S. 471, 487, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (quoting *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939)). The state has "the burden of demonstrating that the causal connection between the statements and the illegal arrest was broken so as to dispel the primary taint of the illegal seizure." *Burns*, 431 A.2d at 1205. Factors to consider include, "[t]he temporal proximity of the arrest and the [consent to search], the presence of intervening circumstances, * * * and, particularly,

the purpose and flagrancy of the official misconduct * * *." *Brown,* 422 U.S. at 603–04, 95 S.Ct. 2254; *see also Jennings,* 461 A.2d at 368; *Burns,* 431 A.2d at 1205–06.

In this case, defendant was detained at the intersection of Hyatt Street and Manton Avenue, ostensibly to investigate whether he was transporting cocaine. He was not advised of his *Miranda* rights, nor told that he was free to leave. He consented to a search of 224 Amherst Street while he was illegally detained, and he did so without any intervening act of significance to break the connection between the illegal arrest and the consent. *See Dunaway,* 442 U.S. at 219, 99 S.Ct. 2248 ("No intervening events broke the connection between petitioner's illegal detention and his confession."). The defendant's motion to suppress the cocaine seized at 224 Amherst Street should have been granted.

Finally we address the search and seizure at defendant's home. Although we reach the same conclusion and are satisfied that defendant's consent was the product of an illegal arrest, we are also of the opinion that the voluntariness of defendant's consent was called into question when he refused to sign the consent form until he spoke to his lawyer.

According to the testimony, after he was notified that he was under arrest and apprised of his *Miranda* warnings, defendant denied he had any money or cocaine at his home. According to Lt. Neill, when asked if the police could search his home, defendant allegedly agreed. However, it is undisputed that he refused to consent in writing until he spoke to his lawyer. This did not occur. Although the trial justice found that defendant never withdrew his consent to search, he overlooked this evidence. Based on our *de novo* review, we are of the opinion that when defendant refused to sign the consent-to-search form, Lt. Neill was under an obligation to inquire further and to satisfy himself that defendant had not withdrawn his consent. When a police officer presents a suspect with a consent-to-search form, the officer either is seeking or confirming consent. If the suspect refuses to sign the form, the officer must inquire further to determine whether the suspect has consented or has withdrawn consent. Accordingly, the motion to suppress the evidence seized from defendant's home should have been granted.

## III

### Conclusion

We do not lightly undertake this holding. However, it long has been recognized that the exclusionary rule is a prophylactic device designed to deter constitutional transgressions by law enforcement. We deem this such an occasion. The public has a right to be protected from illegal searches and seizures, and "the procedural safeguards that were violated in this case guarantee constitutional rights to 'those suspected of being or known to be, offenders as well as to the innocent.'" *State v. Robinson,* 658 A.2d 518, 522 (R.I.1995) (quoting *State v. Nunez,* 634 A.2d 1167, 1171 (R.I.1993)).

For these reasons the judgment of conviction is vacated, and the papers of this case are remanded to the Superior Court.