July 20, 2023

**Supreme Court**

(Dissent begins on Page 23)

| | | |
|---|---|---|
| State | : | No. 2021-164-C.A. |
| | | (K2/19-284A) |
| v. | : | |
| Jerome Joseph. | : | |
| | | |
| State | : | No. 2021-166-C.A. |
| | | (K2/19-284B) |
| v. | : | |
| Voguel Figaro. | : | |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State            :          No. 2021-164-C.A.
                                  (K2/19-284A)

v.             :

Jerome Joseph.       :

State             :          No. 2021-166-C.A.
                                  (K2/19-284B)

v.             :

Voguel Figaro.       :

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**  In these consolidated cases, the state appeals from two Superior Court orders granting motions to suppress filed by the defendants, Jerome Joseph and Voguel Figaro.  On appeal, the state asserts that the hearing justice erred because: (1) the state police had reasonable suspicion to support detaining the defendants and allowing a police dog to perform a narcotics sniff; and (2) no evidence of racial bias existed.  These matters came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in the appeals should not be summarily decided.  After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has

- 1 -

not been shown and that the appeals may be decided without further briefing or argument.  For the reasons set forth herein, we affirm the orders of the Superior Court.

# I

## Facts and Travel

A criminal information was filed in Kent County Superior Court on April 19, 2019, charging defendant Joseph with one count of carrying a firearm without a license in a vehicle, one count of possession of a stolen firearm, one count of importing or transferring armor-piercing bullets, and one count of giving a false driver's license to police. The same information charged defendant Figaro with one count of importing or transferring armor-piercing bullets.

Figaro thereafter filed a motion to suppress physical evidence seized as the result of a motor vehicle stop.  He asserted that a state police officer unconstitutionally prolonged the traffic stop to ask questions and "perform a dog sniff, which were both unrelated to the traffic enforcement mission, and asked and conducted in the absence of reasonable suspicion," in violation of the Fourth Amendment.  Joseph also filed a motion to suppress and joined the memorandum filed in support of Figaro's motion to suppress.

A hearing on defendants' motions was held on April 7, 2021.  Rhode Island State Police Trooper Andrew Elsing testified to the following.  On Thursday, June

21, 2018, he was working in a marked police vehicle on Route 95 in Warwick accompanied by his K-9. He observed a minivan "abruptly swerve into the first lane of travel to the right, which caused it to almost strike another vehicle at which point to avoid striking the vehicle it swerved back to the left." The van then turned off the highway at an exit, and continued to drive with the turn signal on, leading Officer Elsing to "believe that the driver was distracted." After following the vehicle for some distance, Officer Elsing saw the driver make an illegal U-turn and pull into a gas station parking lot. As the car was parking, the trooper activated his emergency overhead lights and pulled in directly behind it.

Officer Elsing approached the driver's side window and observed three individuals in the vehicle. Upon Officer Elsing's approach, the driver (Figaro) "immediately began speaking at a high rate very quickly, both stating comments and asking questions all at once." Officer Elsing then requested license, registration, and insurance from Figaro, and informed him that "his driving behavior * * * [was] very erratic." Figaro then indicated that "he just wanted to go to the gas station for some food and gas"; however, Officer Elsing noticed that Figaro had over half a tank of gas. According to Officer Elsing, when Figaro handed over the requested documents "his hand was shaking uncontrollably" and "his breathing certainly increased." The other two passengers turned over their identification documents to Officer Elsing as well.

Officer Elsing testified that he directed Figaro to exit the vehicle based on his nervousness and driving behavior "so that it would be a one-on-one conversation * * *." He asked Figaro where he was coming from; in response, Figaro indicated that he was driving back from Virginia after visiting family. Figaro explained that he and Joseph had driven down on Tuesday and were on their way back to Massachusetts. Figaro also stated that they had stopped in New York for gas and food. Officer Elsing observed that, although "[t]here was only a high of approximately 72 degrees that day, * * * [Figaro] was sweating profusely * * *." He also observed Figaro "pacing back and forth looking both directions[,]" and he stated that he "instructed him multiple times to stay at the rear of the vehicle." When he asked Figaro if he was nervous, Figaro replied "No, man, I just don't know why you stopped me; I didn't do anything wrong." When asked for the other passengers' names, Figaro could only provide their first names: JJ (Joseph) and Anaika (Whyles).

Officer Elsing said that he then spoke with defendant Joseph, who told the officer that they were coming from Virginia, where they had gone to pick up an engine, which he stated was in the back of the van. Because he considered defendants' statements to be conflicting, Officer Elsing asked Joseph to step out and stand at the front of the vehicle. He indicated that he observed a large car engine in the rear of the vehicle. According to Officer Elsing, Joseph stated that Figaro picked

- 4 -

him up in Massachusetts on Tuesday to drive down to Virginia and that they were on their way back to Massachusetts.

Another officer, Corporal Daniel O'Neil of the Rhode Island State Police, arrived on the scene and ran "checks" on the identification documents; however, he was unable to retrieve a result for Joseph's driver's license. Joseph stated that his license was "good" but that he had one arrest in Massachusetts. A further check was done in Massachusetts that revealed a recent arrest for Joseph, but with a different first name and date of birth than that of the license Joseph had originally provided. On cross-examination, Officer Elsing confirmed that, at that point, he did not place Joseph under arrest, pat him down, put him in handcuffs, or "arrest him for giving a fake name or providing [a police officer] with a false document" because they "had not determined who he was."

Officer Elsing thereafter returned to the vehicle and asked Figaro if he had anything illegal in the vehicle, to which Figaro responded, "No way man; this is crazy." Officer Elsing further asked Figaro if he had any weapons in the vehicle, and Figaro replied, "[N]ah, man." He also asked him if he had any illegal narcotics in the vehicle, and Figaro responded, "Come on, man. This is crazy. You said you stopped me because of some crazy driving or something." When Officer Elsing asked Figaro if he could check the vehicle for contraband, Figaro replied, "[L]et's see how my license comes back. Then we will talk." Officer Elsing explained that

Figaro's license "came back active," but that he was prepared to arrest defendant Joseph for providing a fake driver's license. He then asked Figaro again if he could check the vehicle for contraband, and Figaro replied, "No, man. I feel like this shit is crazy. You stopped me for no reason, now you want to look in my car. If you have a warrant you can look in the car."

Officer Elsing testified that he informed Figaro that he was going to have his K-9, King, perform a dog sniff, and he said that all three of the vehicle's occupants were instructed to sit on the curb. Officer O'Neil testified that he believed that Officer Elsing made the decision to conduct a dog sniff "once he went back to his vehicle [and] gathered his thoughts * * *." According to Officer Elsing, "King provided a positive indication for narcotics at the operator's door." He testified that Figaro explained that it was because they had "smoked weed about two or three hours ago and the stuff [wa]s in the driver's door." Officer Elsing then placed King inside the vehicle, and King "had his head over in the area of the cargo bay, which is in close proximity to where the car engine was located[,]" and King "indicate[d]" the area in "the rear passenger side seat, the furthest rear passenger seat." When the trooper asked all three occupants why the dog so indicated, Joseph stated, "I smoked weed in the back of the van today but there is nothing left. The wrapper is in the cup holder. I will show you." Officer Elsing allowed Joseph to retrieve a cup from that area which contained "remnants of marijuana and other tobacco products."

Officer Elsing testified that, after Joseph opened the rear hatch, "[Officer] O'Neil observed * * * in plain view a bulletproof vest and a box of bullets as well as some loose bullets * * *." Officer Elsing then "performed a Terry pat [down] on all three occupants[,]" which did not yield anything. Officer Elsing opened the passenger side sliding door and found a camouflage duffle bag containing a firearm. Figaro and Joseph were then detained without incident, and Officer Elsing confirmed that he read defendants their "*Miranda* Rights[.]"[1]

According to Officer Elsing, Figaro then stated, "Okay listen, it is just stuff I need to send to my people. I'm running this stuff. That is all. I'm just running it back then we ship it out." He testified that Figaro further stated that "he was given the vest and ammo from his military friend in Virginia" and that the firearm was not his. The occupants were then taken to the Wickford State Police Barracks.

On cross-examination, Officer Elsing gave a more specific timeline of events. He affirmed that the stop began closer to 5:30 p.m., with Officer O'Neil arriving on the scene at about 5:40 p.m. He retrieved his K-9, King, from his police vehicle at about 6:20 p.m. to perform the dog sniff. On his cross-examination, Officer O'Neil confirmed that he checked Figaro's license, which came back active and in good standing, at 5:41 p.m., and he recalled that "for the next eight minutes [he did not]

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

run any other kind of inquiry[.]" According to the search report, Officer O'Neil appears to have run more inquiries at 5:49 p.m.

Additionally, during Officer O'Neil's testimony, the hearing justice asked him: "[D]o you find when you as a law enforcement officer stop individuals of certain people of color, certain ethnicities that are stopped that -- do you see any difference in their state of nervousness or emotions as opposed to others?" After some confusion by the witness, the hearing justice went on to state and ask,

> "If I was stopped I think what any normal or ordinary person would feel is a little bit of that at least at different levels but just because of the obviousness in this case, we have two men of color stopped and being questioned, not saying questioned inappropriately or in an intimidating fashion, but they are stopped. They are who they are, we are who we are, they are being questioned potentially about at least traffic offenses and fines associated with that or something more. Do you find it any different in the level of nervousness of those folks? Those who are not individuals of certain ethnicity or color."

In response, Officer O'Neil testified that he has observed in "every traffic stop no matter who it is, the person is always in crisis[,]" because their routine has been disrupted "with a traffic stop such as this * * *."

The parties presented arguments on the motion on April 28, 2021.[2] At that hearing, the hearing justice explained that his "short colloquy with [Officer O'Neil]

---

[2] At the end of the first hearing on April 7, the hearing justice instructed the parties to draft memoranda supporting their respective positions. He indicated at the April

at the end of the hearing focused on whether that nervousness would be more prevalent to individuals of color or dark skinned occupants of a motor vehicle that has been stopped by" law enforcement officers. The hearing justice issued a decision on May 10, 2021, granting both defendants' motions to suppress.

The hearing justice commenced his decision with a discussion of the "Stanford Open Policing Project" and racial disparity in policing, noting that he was "unable to ignore that race and implicit bias may be a consideration in the initiation of traffic stops and a law enforcement officer's decision to perform a warrantless search of a vehicle[,]" adding that he was "mindful of these issues" in his evaluation of the instant case.

In his analysis of the motions before him, the hearing justice began by describing the two-step analysis for traffic stops, in which a court reviews "whether the initial stop was justified" and "whether the police had a legal basis to justify an investigation beyond the scope of the reason for the stop itself." (Quoting *United States v. Orth*, 873 F.3d 349, 353-54 (1st Cir. 2017).)

Although not contested by defendants in Superior Court, the hearing justice first determined that the initial stop of Figaro's vehicle was justified because he found Officer Elsing's testimony concerning erratic driving to be credible.

---

28 hearing that he "received memos from both sides"; however, we have been unable to locate such memoranda in the record.

- 9 -

Next, he addressed whether the legitimate traffic stop was impermissibly prolonged, in violation of the Fourth Amendment. He stated that the question to be addressed, pursuant to *Rodriguez v. United States*, 575 U.S. 348 (2015), was "whether [Officer] Elsing's decision to perform a dog sniff added time to the stop of Figaro's vehicle." He was concerned with the length of defendants' detention, noting that "the stop lasted for approximately an hour based on the credible testimony of [Officer] Elsing." Furthermore, the hearing justice cited *Rodriguez* for the proposition that "[a] seizure justified only by a police-observed traffic violation * * * 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete the mission' of issuing a ticket for the violation." *Rodriguez*, 575 U.S. at 350-51 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

The hearing justice acknowledged the state's argument that this stop was longer than the average traffic stop because Officer Elsing had to confirm the identities of Joseph and Whyles; however, he found that Officer Elsing "deviated from his traffic enforcement mission of issuing Figaro a ticket for a traffic violation when he decided to conduct the dog sniff" after the identification checks were completed. He couched this finding in his observation that, rather than issuing a traffic citation—which would have completed the purpose of the stop—Officer Elsing "decided to pursue a narcotics investigation." The hearing justice therefore determined that Officer Elsing prolonged the stop because "the length of

- 10 -

[d]efendants' detention exceeded the bounds of a regular traffic stop and * * * [Officer] Elsing decided to conduct a dog sniff rather than complete the mission of the stop * * *."

The hearing justice then addressed whether Officer Elsing had reasonable suspicion to justify prolonging the stop. He determined that, based on "the sequence of events that led up to the dog sniff, there were few facts that, when viewed together, could provide [Officer] Elsing with reasonable suspicion to believe criminal activity was afoot." He further observed that the defendants fully complied with the request "for the vehicle's registration as well as their identification cards, they did not act evasively during questioning, they were polite and cordial, and they did not make any furtive movements."

The hearing justice additionally addressed the "conflicting" statments of Figaro and Joseph relating to the purpose of their travel highlighted by Officer Elsing, finding the discrepancy to be "of minimal assistance to the * * * reasonable suspicion analysis." He determined that "the only articulable facts available to [Officer] Elsing before the dog sniff were the [d]efendants' nervousness and Joseph's false Florida driver's license that he provided to the troopers for purposes of the law enforcement check." Relying on jurisprudence from Massachusetts and New York, he found nervousness not to be a "significant factor" in the reasonable-suspicion analysis, noting Officer O'Neil's testimony that "everyone is

- 11 -

inherently nervous and in 'crisis' during a traffic stop because their routine is disrupted."

The hearing justice ultimately found that, "nervousness coupled with a passenger's false driver's license is insufficient to establish the reasonable suspicion required to prolong the traffic stop of Figaro's vehicle in order to conduct a dog sniff." He indicated that there was "no evidence available to [Officer] Elsing that would provide a reasonable inference that the [d]efendants were involved in drug trafficking." He therefore determined that the evidence seized from the vehicle was the "fruit of the unlawful stop" and he granted both defendants' motions to suppress.

An order entered in each case granting each defendants' motion to suppress on January 5, 2022. The state filed premature but valid notices of appeal on May 28, 2021. The cases were consolidated by order of this Court on September 9, 2022.

## II

### Standard of Review

When reviewing a motion to suppress, this Court "will not overturn a trial justice's factual findings unless they are clearly erroneous." *State v. Johnson*, 251 A.3d 872, 883 (R.I. 2021) (quoting *State v. Washington*, 189 A.3d 43, 56 (R.I. 2018)). The Court "must make an independent examination of the record to determine if the defendant's rights have been violated." *Id.* (quoting *Washington*, 189 A.3d at 56).

- 12 -

Additionally, this Court reviews "a trial justice's determination of the existence or nonexistence of probable cause or reasonable suspicion on a *de novo* basis." *State v. Santos*, 64 A.3d 314, 319 (R.I. 2013) (quoting *State v. Goulet*, 21 A.3d 302, 311 (R.I. 2011)).

## III

## Discussion

### Reasonable Suspicion

On appeal, the state argues that the hearing justice erred in suppressing evidence seized and statements made during the traffic stop. Specifically, the state submits that the traffic stop was not unnecessarily prolonged and that there was reasonable suspicion of criminal activity to support the officer's detention of defendants and the dog sniff of the vehicle. The state contends that the hearing justice misconstrued *Rodriguez* and did not consider all the facts before him, which resulted in an incorrect analysis.

In response, defendants argue that the hearing justice was correct in finding that actions taken by Officer Elsing amounted to a constitutional violation because he lacked reasonable suspicion to detain defendants and to perform a dog sniff.[3]

---

[3] We note that defendant Figaro did not file a prebriefing statement pursuant to Article I, Rule 12A of the Supreme Court Rules of Appellate Procedure, but rather moved to join in the Rule 12A counterstatement and supplemental prebriefing statement filed by defendant Joseph, on the grounds that "the facts and issues are

- 13 -

Therefore, defendants argue that the hearing justice did not err in granting their motions to suppress all items found within the vehicle and the statements made after the arrest.

"It is well established that when a police officer makes a traffic stop, both the driver and any passengers are seized within the meaning of the Fourth Amendment, regardless of the brevity of the stop." *State v. Parra*, 941 A.2d 799, 803-04 (R.I. 2007). "The Fourth Amendment does not prohibit all seizures, but rather, requires that every seizure be reasonable." *Id.* at 804 (citing *State v. Quinlan*, 921 A.2d 96, 106 (R.I. 2007)). We have also held that "an officer can order the driver and passengers to get out of a lawfully stopped vehicle without violating the Fourth Amendment's prohibition against unreasonable searches and seizures." *Id.* (quoting *Quinlan*, 921 A.2d at 108).

However, "once the purpose of the stop has been accomplished, a police officer may not detain a suspect and embark upon an expedition for evidence in the hope that something might turn up." *Parra*, 941 A.2d at 804 (brackets omitted) (quoting *State v. Casas*, 900 A.2d 1120, 1133 (R.I. 2006)).

Officer Elsing appears to have primarily relied on his observations of Figaro's nervousness, as manifested in physical reactions such as extreme sweating and rapid

identical and * * * joining the [c]ounterstatement of [defendant Joseph] would further the interest of judicial economy." This Court granted both motions to join.

speech, the variation in defendants' stated purpose of travel, and the provision by Joseph of a fake driver's license, to conclude that he had sufficient reasonable suspicion to prolong the traffic stop in order to conduct a dog sniff of the vehicle. In our opinion, these factors, when viewed in their totality, were insufficient to support a reasonable suspicion that illegal activity was afoot.

Recently, in *Rodriguez*, the Supreme Court addressed the permissible duration of a routine traffic stop. The Supreme Court opined that "[a] seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez*, 575 U.S. at 354. The Supreme Court observed that, "[l]ike a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop * * * and attend to related safety concerns[.]" *Id.* The Supreme Court "cautioned that a traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete the mission' of issuing a warning ticket." *Id.* at 354-55 (brackets omitted) (quoting *Caballes*, 543 U.S. at 407).

Additionally, while "an officer's mission includes 'ordinary inquiries incident to the traffic stop[,]'" such as checking a driver's license, inspecting the vehicle's registration and proof of insurance, and determining whether there are any outstanding warrants against the driver, "[a] dog sniff, by contrast, is a measure aimed at 'detecting evidence of ordinary criminal wrongdoing.'" *Rodriguez*, 575

- 15 -

U.S. at 355 (brackets omitted) (first quoting *Caballes*, 543 U.S. at 408, then quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000)).

We observe at the outset that this was not a brief traffic stop; it had been ongoing for approximately fifty minutes before Officer Elsing conducted the dog sniff. Our analysis, therefore, hinges on whether Officer Elsing had reasonable suspicion to prolong the stop to conduct a dog sniff. We agree with the hearing justice and conclude that the facts in their totality were not sufficient to establish reasonable suspicion.

"[I]n evaluating the constitutionality of a stop, the totality of the circumstances must be taken into account." *State v. Ditren*, 126 A.3d 414, 419-20 (R.I. 2015) (quoting *State v. Foster*, 842 A.2d 1047, 1050-51 (R.I. 2004)). "Additionally, this Court has enumerated factors that contribute to a finding of reasonable suspicion, including the location in which the conduct occurred, the time at which the incident occurred, the suspicious conduct or unusual appearance of the suspect, and the personal knowledge and experience of the police officer." *Id.* at 420 (quoting *Foster*, 842 A.2d at 1051).

The state contends that the hearing justice erred in analyzing Figaro's nervousness and Joseph's false driver's license in isolation, and in concluding that these facts were insufficient to establish reasonable suspicion to prolong the traffic stop for a dog sniff. The state submits that the hearing justice should have considered

- 16 -

these facts together with the inconsistent information provided by both defendants as to their interstate travel and Figaro's inability to provide basic information about the passengers, despite claiming close relationships.

Our review of the decision, however, reveals that the hearing justice addressed each of these facts, among others, and ultimately dismissed them as being insufficient, in their totality, to establish reasonable suspicion to prolong the traffic stop. He noted that some courts have found that "certain facts such as excessive nervousness, inability of an occupant to confirm his or her identity, conflicting stories about travel plans, evasive moments by an occupant, as well as an occupant's body language and displayed aggression, when viewed together, justify a prolonged traffic stop." (Citing *Orth*, 873 F.3d at 356, and *United States v. Sowers*, 136 F.3d 24, 27 (1st Cir. 1998).) Nevertheless, in his decision, the hearing justice indicated, and we agree, that "there were few facts that, when viewed together, could provide [Officer] Elsing with reasonable suspicion to believe criminal activity was afoot."

Our *de novo* review leads us to the same conclusion. Figaro was pulled over by Officer Elsing for erratic driving, which defendants do not contend was unreasonable. Based on the testimony of the officers, each defendant complied with the instructions given to them throughout the encounter. The only difference in the stories defendants provided to Officer Elsing regarding their travel was the purpose of the travel; both indicated that they traveled to Virginia on Tuesday and were on

their way home to Massachusetts at the time of the stop. We further agree with the hearing justice that the divergence of defendants' stated purposes of travel did not necessarily render either false; the information relayed was "relatively consistent[.]"

Upon reviewing the documents given to them by Figaro, Joseph, and Whyles, Officer Elsing and Officer O'Neil determined that Joseph had provided false identification. The facts indicate that the officers did not place Joseph under arrest for providing false documents to a police officer, pat him down, or put him in handcuffs; they did not even question him further regarding the discrepancy. Officer Elsing testified that, "[a]t that point, due to the individual providing a fake driver's license with different names and dates of birth, at that point at the very least that individual could and would be arrested." The officers could have arrested Joseph and given Figaro a ticket for his erratic driving, thereby completing the purpose of their mission; and yet, they did not. *See Rodriguez*, 575 U.S. at 354-55.

Additionally, Officer Elsing asked Figaro for consent to search his vehicle twice. Both times, Figaro refused to give consent. Our review of the record indicates that these conversations took place *after* the officers had established that Joseph provided a false driver's license. During the first instance, Officer Elsing testified that he asked Figaro if he could check the vehicle for contraband and that Figaro replied, "[L]et's see how my license comes back. Then we will talk." Officer Elsing then spoke with Officer O'Neil, who was locating information about the individuals

- 18 -

and had determined that Joseph provided a false license; following that conversation, Officer Elsing told Figaro that his license "came back active." Officer Elsing then asked Figaro again if he could check the vehicle for contraband, and Figaro replied, "No, man. I feel like this shit is crazy. You stopped me for no reason, now you want to look in my car. If you have a warrant you can look in the car."

The facts reveal that, after Figaro twice refused to give Officer Elsing consent to search the vehicle, he "detain[ed] [the] suspect[s] and embark[ed] upon an expedition for evidence in the hope that something might turn up." *Parra*, 941 A.2d at 804 (brackets omitted) (quoting *Casas*, 900 A.2d at 1133). Officer Elsing's testimony indicates that, after Figaro's second refusal of consent, he informed him that he would be performing a dog sniff. The testimony of Officer O'Neil, however, indicates that Officer Elsing took an unspecified amount of time in his car to collect his thoughts before performing the dog sniff fifty minutes after the commencement of the stop. Specifically, Officer O'Neil testified: "[His plans] changed, I believe, once he went back to his vehicle, gathered his thoughts, he returned out of his vehicle and then made the decision to utilize his canine." Regardless of the time that Officer Elsing decided to perform the dog sniff, by doing so, he had ventured beyond the bounds of the traffic stop without reasonable suspicion to do so.

The Supreme Court in *Rodriguez* rejected the government's argument that "by completing all traffic-related tasks expeditiously, an officer can earn bonus time to

pursue an unrelated criminal investigation." *Rodriguez*, 575 U.S. at 357. Instead, the Supreme Court stated that "[t]he reasonableness of a seizure * * * depends on what the police in fact do[,]" and, further, "[t]he critical question * * * [is] whether conducting the sniff prolongs—*i.e.*, adds time to—the stop[.]" *Id.* (internal quotation marks omitted).

It is clear to us that, this traffic stop, like that in *Rodriguez*, was "'prolonged beyond the time reasonably required to complete the mission' of issuing a warning ticket." *Rodriguez*, 575 U.S. at 354-55 (brackets omitted) (quoting *Caballes*, 543 U.S. at 407). We are further satisfied that reasonable suspicion of criminal activity did not exist in order to detain defendants beyond completion of the traffic infraction investigation. Accordingly, we hold that the hearing justice did not err in granting defendants' motions to suppress.

**Racial Bias**

The state additionally contends that evidence of racial bias did not exist in this case. Specifically, the state submits that "[w]hile the court's discussion [regarding race and implicit bias] prefaced—and seemingly shaped—its decision to grant Joseph's motion to suppress, Joseph did not raise a claim of selective prosecution and conceded that the traffic stop in this case was initiated based on valid infractions."

- 20 -

Indeed, the hearing justice began his decision by discussing racial disparity in policing, citing the "Stanford Open Policing Project[,]" as well as a study commissioned by the State of Rhode Island and the United States Supreme Court case of *Whren v. United States*, 517 U.S. 806 (1996). He indicated that he was "unable to ignore that race and implicit bias may be a consideration in the initiation of traffic stops and a law enforcement officer's decision to perform a warrantless search of a vehicle," adding that he was "mindful of these issues" in his evaluation of the instant case.

Although the Court takes no issue with the validity and importance of the studies relied on, we note that the hearing justice improperly interjected those studies and the issue of racial bias *sua sponte*. *Cf. D'Alessio v. State*, 101 A.3d 1270, 1278 (R.I. 2014) (agreeing that "the hearing justice incorrectly, and *sua sponte*, passed on the issue of ineffective assistance of [the] applicant's trial counsel," where neither party had raised that issue); *Providence Journal Company v. Convention Center Authority*, 824 A.2d 1246, 1248 (R.I. 2003) (stating that the trial justice erred in *sua sponte* ordering additional redactions that the defendant had never requested). We stress that a trial justice need not "ignore that race and implicit bias may be a consideration in the initiation of traffic stops and a law enforcement officer's decision to perform a warrantless search"; rather, a trial justice should address those considerations when they are *argued* and *raised* by defense counsel to support a

- 21 -

motion to suppress. *Cf. Bruce Brayman Builders, Inc. v. Lamphere*, 109 A.3d 395, 398 (R.I. 2015) ("[W]e adhere to the principle that, 'when a trial justice considers and rules on an issue *sua sponte*, the parties must be afforded notice of the issue and allowed an opportunity to present evidence and argue against it.'" (quoting *Catucci v. Pacheco*, 866 A.2d 509, 515 (R.I. 2005))). Moreover, as highlighted by the hearing justice, defendants never argued that the initial stop of the vehicle was unlawful.

Furthermore, the defendants made no claim of racial animus or selective prosecution at the suppression hearing,[4] and counsel candidly acknowledged at oral argument before us that racial bias was not an issue in this case. Based on our review of the hearing justice's decision, however, we are satisfied that it is amply supported by the evidence adduced at the hearing.

---

[4] We do, however, note that the hearing justice questioned Officer O'Neil during his testimony as to "whether the nervousness would be more prevalent to individuals of color or dark skinned occupants of a motor vehicle that has been stopped by" law enforcement officers. Defense counsel for Joseph thereafter cited the Supreme Judicial Court of Massachusetts's opinion in *Commonwealth v. Warren*, 58 N.E.3d 333 (Mass. 2016), for the proposition that "hand shaking, sweating, [and] rapid speech * * * are all heightened in a person who spends their life encountering police in" a similar manner to the facts in the case at bar. The state does not take issue with the colloquy or the argument to that point, and, therefore, we need not address it at this time.

## IV

## Conclusion

For the reasons set forth herein, we affirm the orders of the Superior Court. The record may be returned to the Superior Court.


**Justice Robinson, dissenting in part.**  I respectfully, but unequivocally, dissent.[1]  It is my view that the Superior Court erred in granting the motions to suppress.  In my judgment, the majority opinion contains the "best evidence" as to why those motions should not have been granted—namely, the plethora of troubling conduct and unusual behavior that was meaningful to the experienced police officers.  The majority opinion competently describes at some length that conduct and behavior, and I need not repeat that narrative.  Where I differ from the majority is in my conviction that Officer Elsing and Officer O'Neil had an ample basis for having a reasonable suspicion of criminal activity and that they acted reasonably at all times in accordance therewith. *See United States v. Arvizu*, 534 U.S. 266, 277 (2002) (endorsing a "totality of the circumstances" approach to the question of whether a law enforcement officer had reasonable suspicion to believe that an individual was engaged in illegal activity).  Accordingly, I respectfully dissent.

---

[1]  I wish to be clear that I am dissenting solely from the Court's opinion relative to the "reasonable suspicion" issue.  I am not dissenting from the section of the Court's opinion entitled "Racial Bias."



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Jerome Joseph. <br> State v. Voguel Figaro. |
| **Case Number** | No. 2021-164-C.A.  (K2/19-284A) <br> No. 2021-166-C.A.  (K2/19-284B) |
| **Date Opinion Filed** | July 20, 2023 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Kent County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Daniel A. Procaccini |
| **Attorney(s) on Appeal** | For State: <br><br> Mariana Ormonde <br> Department of Attorney General |
| | For Defendant: <br><br> Angela M. Yingling <br> Office of the Public Defender |