STATE

v.

**Robert P. JENNINGS.**

No. 81–215–C.A.

Supreme Court of Rhode Island.

June 3, 1983.

Dennis J. Roberts II, Atty. Gen., David H. Leach, Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Asst. Public Defender, for defendant.

## OPINION

BEVILACQUA, Chief Justice.

The defendant, Robert P. Jennings, appeals from judgments of conviction entered on a two-count indictment after a jury trial in the Providence County Superior Court. Count 1 of the indictment charged the defendant with murdering one Robert Cappelli on November 4, 1979, in violation of G.L. 1956 (1969 Reenactment) § 11–23–1. Count 2 charged the defendant with possession of a firearm while committing a crime of violence on said date in violation of G.L. 1956 (1969 Reenactment) § 11–47–3. After due deliberations the jury found the defendant guilty of the lesser included offense of manslaughter on count 1. In regard to the other count, the jurors found the defendant guilty as charged.

At trial, the following facts were established. On November 4, 1979, at approximately 6:30 p.m., the Providence rescue squad responded to 414 Plainfield Street, Providence, as a result of a call by defendant. Upon arrival at the scene, they found a young man in critical condition lying on the ground outside the building. He was suffering from what was later determined to be six gunshot wounds. The victim, Robert Cappelli, was immediately transported to Roger Williams Hospital accompanied by defendant. Shortly thereafter, Cappelli died. The defendant, while at the hospital, told the police that he was a friend of the victim and that the victim had rung his doorbell that evening. He said that when he went downstairs from his second-floor apartment, he found Cappelli bleeding and asking for help. In response to questioning by the police, defendant further stated that the victim frequented a club where he gambled quite a bit and that he owed unknown persons money. The defendant was then taken to the police station to give a witness statement. During this time, defendant was not a suspect.

The police, as a result of the rescue call, also proceeded to 414 Plainfield Street. The first officer on the scene was a patrolman. Shortly thereafter, Sergeant Richard DiCicco and Detectives Martin Hames and Donald Alberico arrived on the scene. DiCicco immediately went to the hospital.

Alberico noticed a bloodstain on the sidewalk and went into the building to speak with the landlady, Mrs. Mary Powers, who lived on the first floor. He and Hames then left and went to the hospital where they spoke briefly with defendant. Alberico then returned to the scene. Meanwhile, Walter Powers, the landlady's son, not knowing that defendant had gone to the hospital, decided to go upstairs to see if defendant knew what was going on. Finding the door to defendant's apartment slightly ajar, he walked in and saw that the apartment appeared to have been ransacked. Concerned, he went downstairs and asked Detective Alberico to accompany him back into the apartment. After pointing out the condition of the apartment, Powers returned to his mother's apartment.

Detective Alberico testified that he noticed a bloodstain at the top of the inside stairway landing outside defendant's apartment. He observed that the apartment appeared to have been ransacked and proceeded to check the four rooms to see if an intruder was present. While checking the rooms, he spotted a spent cartridge on the kitchen floor. In the bathroom he found under the sink an open cupboard with all its contents strewn over the floor. He also noticed a dark open doorway set in one wall but did not at that time notice the stairs behind the door leading from the bathroom to the attic. He checked both the bedroom and the living room and found no one there.

Alberico then left the apartment and went downstairs to the first floor, keeping the apartment "under visual control." When he got downstairs, he saw Lieutenant Detective Pasquale Rocchio, his superior, and asked him to accompany him upstairs to see the ransacked apartment.

Rocchio and Alberico entered the apartment and proceeded to conduct a full scale, intensive search. As a result of this search, the police found and seized five spent cartridges, a box of .22-caliber ammunition, a lit flashlight on the bathroom vanity, and a gun under the mattress in the bedroom. This search further revealed that the dark doorway in the bathroom actually led to the attic, and during a search of the attic, bloodstains on the wallpaper and insulation were discovered. Samples of the blood as well as photographs were taken.

Meanwhile, by approximately 8:30 p.m., defendant had finished giving an oral statement to Detective Collins at the police station. This statement was basically a reiteration of the statements he made at the hospital regarding his relationship with the victim and the victim's gambling.

While defendant was waiting for a ride at the station, Collins received a telephone call from Lieutenant Detective Rocchio who was still at the scene, informing him that a gun and cartridges had been found and that defendant was now a suspect and was no longer merely a witness. Collins then confronted defendant with the evidence, read him his rights, and told him he was a suspect in the homicide. The defendant, "visibly shaken" by the information, agreed to make a statement. He then gave a detailed oral statement regarding the incident wherein he admitted that he had fired the fatal shots.

The defendant moved to suppress the evidence seized from the apartment and his confession on the ground that they were the products of an "unreasonable" search and seizure of defendant's apartment without a warrant in violation of the Fourth Amendment to the United States Constitution and art. I, sec. 6, of the Rhode Island Constitution. The motion was granted in regard to the pistol that was found under the mattress and the blood samples taken from the insulation and the wallpaper in the attic and denied in regard to the remaining tangible evidence. The motion to suppress the confession was denied.

On appeal, defendant raises several issues:

1. Whether the "search" of defendant's apartment without a warrant was "unreasonable" and in violation of the Fourth Amendment.

2. Whether the statements and admissions by defendant in the police station

shortly after the search of the apartment, were constitutionally admissible.

3. Whether the trial justice erred in denying defendant's motion for judgment of acquittal or refusing to vacate the conviction on count 2 because conviction of both the carrying of a firearm during commission of a crime of violence and manslaughter constitutes double jeopardy.

4. Whether the trial justice erred in his supplemental charge when he instructed the jury that in general a person must take all preventive steps, including retreat, before resorting to force.

In view of our disposition of the first two issues, an exhaustive analysis of the remaining issues will be unnecessary.[1]

## I

We first address the validity of the second entry and search of defendant's apartment.

In the instant case, the police never obtained a warrant to search defendant's apartment. The defendant does not contest the legitimacy of the initial entry by Powers and Alberico and Alberico's cursory sweep through the rooms. The defendant contends, however, that any subsequent entry and search of the apartment is illegal because the apartment was "secure" at that point and the authorities should have obtained a warrant. Therefore, defendant argues, all tangible evidence seized during the subsequent search and any "fruits" derived therefrom should be suppressed be-cause they were obtained in violation of the Fourth Amendment and art. I, sec. 6 of the Rhode Island Constitution.

The state argues in response that the second entry and full-scale search were not unreasonable because the exigencies justifying the initial entrance by Alberico were ongoing and the reentry and search were a continuation of that legitimate entry. The state denies defendant's assertion that the apartment was "secure" and contends that Lieutenant Detective Rocchio and other officers were justified in checking the apartment and attic to see if other persons were present who were either wounded or might pose a security risk. Therefore, the state asserts, the evidence that was discovered in plain view during the course of this search was admissible. We disagree.

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *." The amendment requires that generally the authorities must obtain a search warrant from a magistrate which must be based upon probable cause supported by an oath or affirmation. A warrantless search is per se unreasonable unless the circumstances fall within one of the few well-established and limited exceptions to the warrant requirement. *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290, 298–99 (1978). If a warrant is not obtained and the exceptions

---

1. Based upon prior case law and our interpretation of the crime-of-violence statute, conviction of both the carrying of a firearm during the commission of a crime of violence and manslaughter constitutes double jeopardy because the *Blockburger* test is met and we are of the opinion that the crime-of-violence statute was not intended to authorize cumulative punishment for the same conduct.

In regard to defendant's fourth argument, the trial justice did err in his supplemental instruction when he imposed a duty to retreat before using deadly force in one's dwelling. General Laws 1956 (1981 Reenactment) § 11–8–8 reads:

"Injury or death—Defense.

* * * it shall be presumed as a matter of law in any civil or criminal proceeding, that the owner, tenant or occupier of the place wherein the offense was committed, acted in self-defense at the time and in the place where the death of the person or the injury to the person was inflicted, caused or sustained * * *."

We think that it is safe to say that the law of this state is that a person's habitation is not to be disturbed by persons without invitation or warrant and that an individual may use all the force necessary to repel an intrusion of his/her dwelling without the prerequisite of attempting retreat.

are inapplicable, the court will suppress any tangible or testimonial evidence obtained as a direct or indirect result of the illegal search and seizure, as a sanction for the violation of the individual's constitutional right. *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *see Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (Fourth Amendment prohibition against unreasonable searches and seizures applicable to states).

One of the well-recognized exceptions to the warrant requirement is the existence of exigent circumstances. In certain cases, " 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona,* 437 U.S. 385, 394, 98 S.Ct. 2408, 2414, 57 L.Ed.2d 290, 301 (1978). When evidence is likely to be lost, destroyed, or removed during the time required to obtain a warrant and when, because of the circumstances, it is difficult to secure a warrant, a warrantless entry and search may be justified. This exception also encompasses the situation in which police believe a person within requires immediate assistance or other victims or intruders may still be present. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290, 300 (1978) (quoting *Wayne v. United States,* 318 F.2d 205, 212 (D.C.Cir.1963). During the course of such an "emergency" search, police may seize any evidence that is in plain view. *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1950, 56 L.Ed.2d 486, 498 (1978); *Coolidge v. New Hampshire,* 403 U.S. 443, 465–66, 91 S.Ct. 2022, 2037–38, 29 L.Ed.2d 564, 582–83 (1971).

We are of the opinion that this case is controlled by *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). An examination of the facts in the instant case and a reading of *Mincey* clearly disclose that the circumstances surrounding the search are similar.

In *Mincey* an undercover officer, backed up by a group of narcotic officers, attempted to make a narcotics purchase at the defendant's apartment pursuant to a prearranged plan. When the apartment door was opened, the agent quickly slipped inside and moved into the bedroom where he encountered Mincey. As the other officers pressed their way into the apartment, shots were heard from the bedroom. The undercover agent was fatally wounded, and Mincey was seriously injured. The other officers quickly checked for other victims, discovering an injured young woman in the bedroom closet as well as Mincey's three acquaintances in the living room. No further investigation was undertaken by the agents involved in the "bust." They merely guarded the suspects and premises. Shortly thereafter, homicide detectives arrived on the scene and took control of the investigation. Over a four-day period they conducted an intensive full-scale search, photographed and diagrammed the entire apartment, and seized considerable evidence. No warrant was ever obtained.

The Arizona Supreme Court held that this type of prompt warrantless search of the scene of a homicide does not violate the Fourth Amendment when the authorities are legally on the premises in the first instance and the purpose of the search is limited to determining the circumstances of death. The United States Supreme Court reversed and rejected the theory that the circumstances of a possible homicide justify a warrantless search, that is, there is no "murder-scene" exception to the warrant requirement.

In reversing the Arizona Supreme Court, the Court reiterated the basic concept that "[t]he Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amend-

ment—subject only to a few specifically established and well-delineated exceptions.'" *Mincey v. Arizona,* 437 U.S. at 390, 98 S.Ct. at 2412, 57 L.Ed.2d at 298–99 (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967)). The Court then went on to discuss the emergency or exigent-circumstances exception to the warrant requirement. The Court acknowledged that police officers may legitimately make warrantless entries and searches "when they reasonably believe that a person within is in need of immediate aid." *Mincey v. Arizona,* 437 U.S. at 392, 98 S.Ct. at 2413, 57 L.Ed.2d at 300. Similarly, the Court noted, when police respond to the scene of a homicide, they are justified in making an immediate warrantless search of the vicinity to check if other victims or the killer is present. During the course of this type of emergency search, police may legally seize any evidence in plain view.

▮ This type of search, however, must be limited in scope and purpose. The *Mincey* Court stated that such a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation." *Mincey v. Arizona,* 437 U.S. at 393, 98 S.Ct. at 2413, 57 L.Ed.2d at 300 (quoting *Terry v. Ohio,* 392 U.S. 1, 26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889, 908 (1968)). When the security check has been completed, the area is secured, and there is no longer any danger of the loss or destruction of evidence, the search must cease. Any further intrusion is a violation of the Fourth Amendment.

▮ In the case before us, as in *Mincey,* defendant acknowledges that the search conducted by Detective Alberico when he checked the apartment for any other persons who may have been present or in need of immediate medical attention was constitutionally valid. There is nothing in the record, however, to justify any further intrusion by the authorities without first securing a search warrant. There is no indication that there was any continuing danger to anyone or that the destruction or removal of evidence was imminent. The exigency justifying Alberico's initial entry

and security sweep had ended, and the apartment had been secured. The police then had ample time to obtain a warrant. The fact that a possible homicide in the immediate vicinity was under investigation does not justify a general search. It is inconsistent with the Fourth Amendment to adopt the position that "the seriousness of the offense under investigation itself creates exigent circumstances of the kind that under the Fourth Amendment justify a warrantless search." *Mincey v. Arizona,* 437 U.S. at 394, 98 S.Ct. at 2414, 57 L.Ed.2d at 301.

When Lieutenant Detective Rocchio arrived on the scene a short time after Detective Alberico had completed his examination of the apartment, the emergency situation no longer existed. In light of the foregoing discussion, the second search of the apartment without a warrant was constitutionally impermissible and any evidence seized during the course of that search should be suppressed.

## II

Now that we have determined that the second search of defendant's apartment was constitutionally impermissible, we must decide whether the confession at the police station is inadmissible because it was the product of an illegal search and seizure.

The defendant agrees with the trial justice's ruling that the search under the mattress and the seizure of the weapon discovered there is a violation of the Fourth Amendment and that therefore the weapon should be suppressed. The defendant contends, however, that the trial justice erred in his determination that the state had sustained its burden of demonstrating that defendant's incriminating statement at the police station was free from the taint of the illegal search and seizure.

The state concedes that the weapon was illegally seized and properly suppressed because it was not in plain view. The state argues, however, that the incriminating statements are admissible because they

were voluntarily given and therefore not tainted by any police misconduct. The defendant was not taken to the police station in custody, and his arrest was subsequent to the giving of *Miranda* warnings and defendant's statement. In addition, the state claims that there was no act of coercion by the police and the misconduct was not purposeful or flagrant. These circumstances, the state alleges, demonstrate that the confession was not the product of the illegal search and seizure and was therefore properly admitted. We disagree.

The exclusionary rule bars from introduction at trial evidence obtained either during or as a direct result of searches and seizures in violation of an individual's Fourth Amendment rights. *Wong Sun v. United States,* 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441, 454 (1963); *State v. Burns,* R.I., 431 A.2d 1199, 1205 (1981). This prohibition extends to indirect as well as direct products of such unlawful actions. *Wong Sun v. United States,* 371 U.S. at 484, 83 S.Ct. at 416, 9 L.Ed.2d at 453; *State v. Burns,* 431 A.2d at 1205. Thus, the United States Supreme Court has held that statements obtained by exploitation of an illegal arrest are "fruits of the poisonous tree" and are therefore inadmissible at trial. *See Wong Sun v. United States,* 371 U.S. at 485, 83 S.Ct. at 416, 9 L.Ed.2d at 454. In order to effectuate the protections of the Fourth Amendment, the same rule must apply when the giving of a statement is induced by confronting a suspect with illegally seized evidence.

Not all statements derived from an illegal arrest or search must be excluded in every case. Such statements may be admissible if the state can establish that the connection between the unlawful action and the subsequent statement has "become so attenuated as to dissipate the taint." *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312 (1939). An individual may make a statement that is "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun v. United States,* 371 U.S. at 486,

83 S.Ct. at 416–17, 9 L.Ed.2d at 454. A finding that a confession may satisfy the voluntariness standards of the Fifth Amendment, however, does not necessarily mean that there is no Fourth Amendment violation. Voluntariness is merely a threshold requirement for the purposes of Fourth Amendment analysis. *Dunaway v. New York,* 442 U.S. 200, 217, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824, 839 (1979); *State v. Burns,* 431 A.2d at 1205. Consequently, giving a suspect *Miranda* warnings alone does not per se make any subsequent statement sufficiently a product of free will to break the causal connection between the confession and the unlawful action. *Taylor v. Alabama,* —— U.S. ——, ——, 102 S.Ct. 2664, 2667–68, 73 L.Ed.2d 314, 319 (1982); *Brown v. Illinois,* 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416, 427 (1975).

The focus of the Fourth Amendment inquiry, therefore, must be "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455 (quoting Maguire, *Evidence of Guilt* 221 (1959)). The court must examine the particular facts of each case and consider the voluntariness of the confession as well as (1) the temporal proximity of the illegality and the confession, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the illegal police conduct. *Brown v. Illinois,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62, 45 L.Ed.2d at 427; *State v. Burns,* 431 A.2d at 1205–06.

Focusing our analysis on the facts of the instant case, we are of the opinion that the confession was obtained by the exploitation of the illegal search of defendant's dwelling.

The police initially considered defendant merely a witness, relying on his statements at the scene of the incident and at the hospital. His status was still that of a

witness when he was taken to the police station to reiterate his essentially exculpatory statements. While defendant was waiting at the station for a ride home, Detective Collins received a phone call from Lieutenant Detective Rocchio, who informed him that a gun, as well as certain other evidence, had been found in defendant's apartment. Collins immediately confronted defendant, telling him that a gun had been found, that he was now a suspect in a homicide, and that he was not telling the police the truth. The detective then read defendant his *Miranda* rights. The defendant, "visibly shaken" by this information, agreed to tell what happened. An oral statement followed in which defendant admitted firing the fatal shots. He refused to sign a written statement and ultimately invoked his right to counsel.

While defendant was at the station, there was no physical coercion by the police and defendant was not in custody. The record discloses that the confession was made immediately upon defendant's being confronted with the information that the police had possession of the gun as a result of an illegal search and seizure. There was no time lapse. There were no intervening events to break the causal chain other than the reading of the *Miranda* warnings, which does not per se purge the taint of the illegality. Additionally, the use of the product of the illegal police conduct to induce defendant to change his story has the quality of purposefulness which the Fourth Amendment seeks to protect against. A reading of the record reveals that the defendant's sudden willingness to incriminate himself was the result of his being confronted with the illegally seized evidence.[2]

We therefore find that the confession was obtained by the exploitation of the illegal search and seizure.

Accordingly, the defendant's confession was tainted and is constitutionally inadmissible at the trial. The trial justice improperly denied the defendant's motion to suppress his confession.

The defendant's appeal is sustained, the judgments of conviction are vacated, and the case is remanded to the Superior Court for further proceedings in accordance with this opinion.

2. The circumstances in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), which persuaded the Court that Wong Sun's confession was not tainted and therefore was admissible are distinguishable from the instant case. Wong Sun was released on his own recognizance after arraignment and returned voluntarily several days later to make a statement. The release, time lapse, and voluntary return made the connection between the confession and his illegal arrest sufficiently attenuated so as to purge the taint.