Justice GOLDBERG,
concurring.
I concur in the judgment of the majority but nonetheless write separately. Of paramount importance in this case is the question of whether the warrantless arrest of the defendant, Tony Gonzalez, in his home and the subsequent search of his bedroom violated the Fourth Amendment to the United States Constitution. As the Supreme Court of the United States has repeatedly and unswervingly declared, any inquiry into the reasonableness of searches and seizures demands a highly fact-driven analysis. See, e.g., Missouri v. McNeely, — U.S. -, 133 S.Ct. 1552, 1559, 185 L.Ed.2d 696 (2013); Ohio v. Robinette, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); Minnesota v. Olson, 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). Accordingly, I recount in detail the salient facts presented at the pretrial suppression hearing in the Superior Court.
The Warwick Police Department was alerted to the shooting at approximately five minutes past midnight on January 22, 2012. By 1 a.m., the police knew the name of the suspect — Tony Gonzalez, defendant in this case. At that time, the police captain gave officers assigned to the case a briefing — lasting about thirty minutes— concerning the details uncovered thus far. The police sergeant then departed for the crime scene while at least four detectives remained at the station to conduct witness interviews.
Detectives Joseph Mee (Det. Mee) and John McHale (Det. McHale) interviewed Patricia Dalomba (Dalomba), defendant’s ex-girlfriend, who had witnessed the shooting. From Dalomba they learned that defendant had fled the scene in a vehicle carrying multiple passengers, which she believed to be owned by defendant’s brother, Juan Zachary Garcia (Garcia). Dalom-ba also told the detectives that, in her experience, defendant carried a handgun at all times. The interview lasted between one-and-a-half and two hours. In a separate interview room, Dets. Thomas DiGre-gorio (Det. DiGregorio) and Timothy Grant (Det. Grant) interviewed Matthew Chivers, Dalomba’s new paramour, who also had been present at the shooting.
At approximately 3 a.m. or 3:30 a.m., a group of officers met to discuss the witnesses’ statements and “tried to * * * piece together some information” in order to locate defendant. They searched for addresses in the computer system and *1160 made multiple telephone calls to defendant’s wireless service provider to determine the location of his mobile telephone. Sometime after 4 a.m., Dets. Grant and DiGregorio left for Providence to pursue a lead based on a telephone call placed from defendant’s telephone to another telephone traced to the Silver Lake neighborhood.
The record discloses that the officers learned that four months earlier, in September 2011, defendant had been involved in another altercation with one of Dalom-ba’s boyfriends and that defendant had surrendered voluntarily to the police. Warwick police dispatchers contacted defendant, who indicated that he intended to turn himself in.
At approximately 5:15 a.m., Dets. Mee and McHale visited the crime scene; they stayed for ten minutes and then returned to the police station. Meanwhile, multiple Warwick officers, accompanied by officers from the West Warwick Police Department and the Rhode Island State Police, visited Garcia at his home. At approximately 6:15 a.m. — six hours after the murder — the officers arranged for Garcia to make a “controlled” telephone call to his brother. During the call, Garcia informed defendant that the police had been at Garcia’s home and were searching for defendant. The defendant told Garcia that he had been asleep, in bed at the home he shared with his mother in the Chad Brown public housing complex in Providence. Before the police departed, Garcia advised them that defendant often sleeps with a handgun under his pillow.
Shortly before 7 a.m., with a credible lead on defendant’s location, six Warwick officers reported to a Providence Police Department substation, where they assembled with at least six members of the Providence Police Department for approximately twenty minutes. Detectives DiGre-gorio and Grant briefed their Providence brethren. An assemblage of uniformed and plainclothes officers from both departments then departed in a “caravan” for defendant’s residence. They traveled in “three marked units and a couple of detective units from Warwick.” At no time had police from either department obtained an arrest warrant or a search warrant, nor had anyone attempted to do so.
Upon arriving at the Chad Brown public housing complex, just after 7 a.m. on a Sunday morning, a phalanx of police officers surrounded the building and established a perimeter around the residence in order to prevent defendant from fleeing. Patrolman Joseph Dosreis (Ptlm. Dosreis) of the Providence Police Department knocked on the front door of defendant’s residence. He carried a tactical shield described as “a protective police shield similar to a riot shield, approximately four [feet] in length and maybe two feet wide.” With him stood two fellow Providence officers; all wore bulletproof vests, with protection helmets that masked their faces. Patrolman Dosreis’s gun was holstered, whereas the other officers’ guns were “displayed.”
The defendant’s mother, Cira Gonzalez (Cira), was awakened by the knock on the door.[14] She descended the staircase from her second-floor bedroom, still wearing her pajamas. When Cira opened the front door, Ptlm. Dosreis yelled, ‘Where’s Tony? Where’s Tony?” at least once or twice. She did not respond verbally. Rather, Ptlm. Dosreis described the encounter as follows:
*1161 “We had eye contact. I asked for Tony, where is he, where is he. And I was under the impression that he would be up in the bedroom so I looked and she looked up toward the stairs and looked like that. (Indicating).”
From Ptlm. Dosreis’s experience as a patrolman, he knew that all bedrooms in the Chad Brown complex were located on the second floor, and he recalled that Garcia had indicated that defendant had been in his bedroom at the time of the controlled call. It is undisputed that Cira did not give oral consent to enter her home; at best, she glanced toward the staircase in response to the officer’s inquiry and made a gesture of some sort. It also is uncontested that Ptlm. Dosreis never asked for permission to enter the home, and, according to Cira, the officers simply pushed their way into the home. At least three officers bounded up the stairs to apprehend defendant.
The sequence of events was disputed by the parties. According to Ptlm. Dosreis, he first looked into the living room to his left and saw a man by the couch who, he determined, was too tall to fit the description of the five-foot-five-inch or five-foot-six-inch suspect. Patrolman Dosreis testified that his gaze returned to the top of the staircase, where he saw a man who fit the description. He then ran up the stairs, followed by other officers. According to Det. Grant, ten to fifteen seconds elapsed from the time that Cira opened the door to the entry into the residence. On the other hand, Cira testified that, by the time she glanced up, the officers already were climbing the staircase. According to Cira, three officers “walked in and * * * [she] had no other choice but to walk back because they were walking in.”
Upstairs, Ptlm. Dosreis and another uniformed Providence officer encountered defendant, wearing only his boxer shorts and a T-shirt, turning his back as if he were attempting to return to his bedroom. Announcing that he was with the “Providence Police,” Ptlm. Dosreis pushed defendant to the floor, face-down, in the area between defendant’s bedroom and the hallway. As he handcuffed defendant with the assistance of another officer, Ptlm. Dosreis asked about defendant’s firearm and where it was located. The defendant responded, “It’s not here.” According to Det. Grant — who had reached the top of the staircase while defendant was being handcuffed — an open handgun case rested in plain view on a table in defendant’s bedroom. Inside was a loaded magazine and some paperwork, but no handgun.
After the arrest, at approximately 7:40 a.m., the police escorted defendant downstairs to the living room and sát him on the couch. The record discloses that there were numerous members of law enforcement in the home at this time. The scene was described by one officer as “chaotic”; before defendant was taken into custody, there was “yelling and screaming,” and officers used profanity. Cira was described by the witnesses as' being “in shock” — she was “crying,” “nervous[,] and scared.” Detective DiGregorio advised defendant of his Miranda rights, and then he and Det. Mee asked defendant about his whereabouts the previous night and the location of the handgun. The defendant repeated that the handgun was not there. Patrolman Dosreis testified that he remained at the home for about ten minutes, at which point the investigation was turned over to Warwick Police. Importantly, Ptlm. Dosreis testified that he not only saw the handgun case in defendant’s second-floor bedroom, “I saw the gun case being taken out of there.”
After defendant was situated on the couch in the living room, Cira went upstairs to find warm clothes for defendant; *1162 she was accompanied by an officer. When she returned with a pair of gray boots— the same color boots that Dalomba had reported that defendant had worn at the time of the shooting — Det. Mee instructed her to retrieve another pair of shoes, which she did. Warwick officers then escorted defendant out of the house and into the back of a marked police cruiser.
As Det. McHale and another officer transported defendant to the Warwick police station, having driven less than one-half mile, they detoured into a nearby parking lot in order for defendant to execute a form consenting to a search of his bedroom. According to Det. McHale, he received a call from the sergeant directing him to inquire if defendant would consent to a search of his bedroom. According to Det. McHale, defendant agreed, and the officers stopped the vehicle; both officers exited the car and opened the rear doors of the cruiser. The other officer read the standard form aloud to defendant, filled out the form, and presented it to defendant, whose handcuffs were removed for ease of reading and signing. This event occurred at 8:06 a.m., within moments of his departure from the home.
Meanwhile, at 8:10 a.m., Cira also executed a consent-to-search form at the request of the police. Detectives Grant and Mee then searched defendant’s bedroom, where they seized a vest, a jacket, a scarf, and a mobile telephone. The handgun case with the loaded magazine, a receipt for a 9-millimeter Taurus handgun, and the gray boots retrieved by Cira also were seized, although exactly when this occurred was not established. It is undisputed that all items were seized from defendant’s bedroom.
The Warrantless Arrest in the Home
When this Court undertakes review of the constitutionality of a warrantless arrest in the home. and the subsequent search and seizure of items from the accused’s bedroom, we do not venture into new constitutional territory. Our task is to look to the holdings of the United States Supreme Court, particularly its longstanding recognition that “[a]t the very core [of the Fourth Amendment] stands ‘the right of a man to retreat into his own home and there be free from unreasonable government intrusion.’ ” Payton v. New York, 445 U.S. 573, 589-90, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). The specter of police officers “thrust[ing] themselves into a home is * * * a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance.” Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). To protect the public against “zealous” “officerfs] engaged in the often competitive enterprise of ferreting out crime,” the Fourth Amendment requires that a “neutral and detached magistrate” review the evidence against a suspect and make a “disinterested” determination whether to issue a warrant. Id. at 13, 14, 68 S.Ct. 367. Any evidence seized as a result of a noneonsen-sual warrantless entry into the home will not' withstand constitutional scrutiny unless a recognized exception to the warrant requirement applies. See Payton, 445 U.S. at 583, 590,100 S.Ct. 1371.
The state argues that the warrantless entry into defendant’s home was supported by both consent and exigent circumstances. A review of the facts in this case demonstrate that there is no set of conceivable circumstances in which Cira provided the officers with consent to enter the apartment. The question of whether there was valid consent is reviewed by this Court de novo. State v. Linde, 876 A.2d 1115, 1124 (R.I.2005). Awakened by a *1163 loud bang on her front door at approximately seven o’clock in the morning, Cira discovered numerous police officers — ‘arrayed in riot gear with masks and shields and weapons drawn — surrounding her home at the Chad Brown public housing complex. Upon opening the door, she found herself face-to-face with a masked officer, equipped with a four-foot-long shield, who demanded to know the whereabouts of her son. Behind him, more officers stood with their guns drawn. When Ptlm. Dosreis demanded' to know where her son was, a speechless Cira glanced or gestured toward the stairs, and several officers ran up the stairs and apprehended defendant, who was standing there in his underwear.
The trial justice concluded that this interaction constituted a consensual entry into the home. He found that the officers entered the apartment “quickly” because they were looking for a person suspected of murder with a firearm within hours of its commission. Thus, he concluded, the police were “not going to waste time spending a lot of time explaining, you know, the background [of why they were there]. ‘Where’s Tony?’ ‘We’re looking for Tony.’ He’s upstairs, and they went upstairs.” Even the most generous reading of this finding does not constitute consent. “The Fourth Amendment prohibition against the warrantless entry into a person’s home does not apply ‘to situations in which voluntary consent has been obtained * * *_>» v_ Barlcmeyer, 949 A.2d 984, 996 (R.I.2008) (quoting Illinois v. .Rodriguez, 497 U.S. 177,181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)). The state bears the burden of proving, “by a fair preponderance of the evidence,” that the lawful occupant of the home voluntarily consented to the police entering his or her home. Id. at 997 (quoting State v. O’Dell, 576 A.2d 425, 427 (R.I.1990)). “[T]he state must prove that the consent was ‘freely and voluntarily given.’ ” State v. Bailey, 417 A.2d 915, 918 (R.I.1980) (quoting Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) and citing Palmigi-ano v. Mullen, 119 R.I. 363, 370, 377 A.2d 242, 246 (1977)). This Court has recognized that the state’s burden of proof to establish valid consent “cannot be discharged by showing no more than acquiescence to a claim of lawful authority.” State v. Beaumier, 480 A.2d 1367, 1374 (R.I.1984), overruled on other grounds, State v. Rios, 702 A.2d 889, 889-90 (R.I. 1997) (quoting Bumper, 391 U.S. at 548-49, 88 S.Ct. 1788). In Beaumier, this Court recognized that “various barometers” have been established “to determine whether the consent was truly voluntary,” including “the number of police officers entering the home, * * * the apprehension of a family member, * * * the time of day, * * * and an outlandish display of weaponry.” Id. Many of those factors are present in this case. First, Cira was not the reason the police awakened her family that morning. She was confronted with numerous armed officers, in riot gear, with masks and shields; no one asked permission to enter, yet several officers rushed up the stairs to apprehend her son, who also may have been sleeping. An allegation that an occupant who is not the person sought by police voluntarily consented in the face of a number of armed officers demands scrutiny. See Loivery v. State, 499 S.W.2d 160, 168 (Tex.Crim.App.1973). “The display of weapons is a coercive factor that sharply reduces the likelihood of freely given consent.” Id. The evidence in this case does not substantiate the burden of proving that the entry into the home in order to arrest defendant was consensual. Accordingly, I am satisfied that in finding a consensual entry; the trial justice clearly erred.
*1164 The state’s next argument, that the exigency of the situation justified the war-rantless entry, is equally flawed. The exigent-circumstances exception to the warrant requirement applies when “there is compelling need for official action and no time to secure a warrant.” McNeely, 138 S.Ct. at 1559 (quoting Michigan v. Tyler, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978)). Examples of circumstances recognized as exigent include “law enforcement’s need to provide emergency assistance to an occupant of a home, * * * engage in ‘hot pursuit’ of a fleeing suspect, * * * enter a burning building to put out a fire and investigate its cause, * * * [and] prevent the imminent destruction of evidence.” Id. at 1558-59; see also State v. Jennings, 461 A.2d 361, 366 (R.I.1983).
“Any warrantless entry based on exigent circumstances must * * * be supported by a genuine exigency.” Kentucky v. King, 563 U.S. 452, 470, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011) (emphasis added). Mere inconvenience to the police does not provide a reasonable basis for forgoing a warrant, Johnson, 333 U.S. at 15, 68 S.Ct. 367 nor does the desire to lead a more ‘“efficient” investigation, Mincey v. Arizona, 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (“[T]he privacy of a person’s home and property may not be totally sacrificed in' the name of maximum simplicity in enforcement of the criminal law.”). Significantly, the gravity of the offense alone fails to create a genuine exigency. Mincey, 437 U.S. at 394, 98 S.Ct. 2408.
Here, the police knew the name of the suspect within the first hour of the investigation, yet more than six hours had elapsed without any effort to obtain an arrest warrant. At the suppression hearing, Det. DiGregorio explained that no warrant was sought because, with an armed murder suspect at large, “time was of the essence” and “[t]o sit down at a desk and type out a warrant at that point in time * * * was a waste of resources.” Detective DiGregorio also indicated that there was concern that, defendant might attempt to destroy evidence, although this fear appeared to be rooted in generalized conjecture rather than specific facts gleaned during the investigation. Extended to its logical conclusion, such reasoning would negate the need for warrants in any murder investigation in which an armed suspect has not been apprehended. Allowing the police to enter the home of every murder suspect without first obtaining the approval of a disinterested judicial officer, in effect, “would reduce the [Fourth] Amendment to a nullity and leave the people’s homes secure only in the discretion of police officers.” Johnson, 333 U.S. at 14, 68 S.Ct.' 367. It is for the judicial officer to determine that probable cause exists for an arrest, not the police who already are entrenched in' the investigation and have developed the understandably single-minded focus of bringing their presumed suspect into custody. See id. These factors are further highlighted by the fact that on a previous occasion when the police were seeking to arrest defendant — certainly not for a brutal homicide — and defendant, upon receiving a telephone call from police dispatch, notified the police of his intended surrender. Although the Warwick detectives were aware of this prior incident, no effort was made to attempt such surrender in this case.
Even the most generous reading of the candid and, indeed, credible testimony of the police officers in this case, reveals that there is no evidentiary support for the hypothesis that defendant intended to harm himself or take more victims. The only evidence as to defendant’s whereabouts was the telephone call made by his brother that revealed he was at home in *1165 bed.' Additionally, over seven hours elapsed from the time of the homicide until defendant was apprehended. No effort was made to secure a warrant for his arrest, yet there were at least four law enforcement agencies involved in this case with sufficient time to assemble a convoy of heavily-armed officers to surround the home.
The facts of this case are in stark contrast with this Court’s holding in State v. Gonsalves, 558 A.2d 1073 (R.I.1989), in which we affirmed a decision denying the defendant’s motion to suppress evidence seized after a warrantless arrest of the defendant in the home of his girlfriend. Id. at 1074, 1076. Less than an hour after he murdered his brother, following “a bitter argument” in a barroom, members of the East Providence Police Department-responded to the home of the defendant’s parents, where they learned the defendant might be at his girlfriend’s apartment in Pawtucket. Id. at 1074. The defendant’s father accompanied the police to the residence. Id. They knocked on the wrong door. Id. A woman emerged from the adjacent unit and was ordered back inside by the officers. Id. They knocked again, and she exited once more, at which point the police asked her if she was the defendant’s girlfriend, and “she responded affirmatively.” Id. When the officers approached her apartment, they observed the defendant sitting on a couch in the living room. Id. After the defendant failed to respond to their repeated entreaties, the officers entered the apartment and arrested the defendant. Id. He struggled with the officers and was less than cooperative. Id. at 1074-75. Bullets from a .38-caliber weapon were seized and introduced into evidence as were the incriminating remarks the defendant made while resisting arrest. Id.
This Court affirmed the decision denying the motion to suppress the evidence in Gonsalves on the ground that an exigent circumstance justifying a warrantless entry and search for evidence may arise when “police believe a person within [the residence] requires immediate assistance or other victims or intruders may still be present.” Gonsalves, 553 A.2d at 1075, 1076 (quoting Jennings, 461 A.2d at 366). We concluded that “[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.” Id. at 1075 (quoting Jennings, 461 A.2d at 366).
The determination of exigency or emergency turns on “the facts known to the police at the time of the arrest.” Gon-salves, 553 A.2d at 1075 (citing United States v. Williams, 612 F.2d 735, 739 (3d Cir.1979)). The police must “have an objective, reasonable belief that a crisis can only be avoided by swift and immediate action.” Duquette v. Godbout, 471 A.2d 1359, 1363 (R.I.1984). None of these considerations is present in this case, particularly where more than seven hours elapsed from the time of the murder to the war-rantless arrest. The subjective, generalized statements of the police — about their concern for destruction of evidence and the possibility that defendant could harm himself or others or escape arrest — are neither sufficient nor fact-based. “The proper line of inquiry is whether the police reasonably believed, relying upon facts known by them at the time of arrest, that the warrantless intrusion was necessary to preserve life or avoid serious injury.” Gonsalves, 553 A.2d at 1075-76. I deem this multidepartment police action to be more akin to a planned arrest than an emergent pursuit in the field.
In an attempt to persuade us that a police-emergency situation justified the ar *1166 rest in this case, the state points to previous decisions of this Court. These cases are distinguishable. State v. Portes, 840 A.2d 1131, 1134-35 (R.I.2004), dealt with evidence seized pursuant to a search warrant after the police were called to an apartment in response to an emergency 9-1-1 call that was hampered by a language barrier. Although no one answered the knock on the door, the police heard running footsteps and a door banging inside. Id. at 1134. A neighbor informed them that the home’s occupant had fled in a taxi with her child. Id. Upon entry, the police observed a firearm on the nightstand and a bag of cocaine on the kitchen counter. Id. at 1134-35. They obtained a search warrant and seized a significant quantity of cocaine under the mattress. Id. at 1135. This Court concluded the police were justified in entering the premises and that, based on the totality of the circumstances, “it would have been unreasonable for the officers to simply walk away from the unanswered door given the 9-1-1 call and other facts known to them.” Id. at 1136, 1137.
Likewise, in State v. Shelton, 990 A.2d 191, 193, 194, 195 (R.I.2010), within moments of a double shooting and homicide, the police discovered the name and address of the perpetrator, and, in less than an hour, they were at the home of Brenda Alvarez, with whom the defendant had “an on-and-off romantic relationship.” They found the door to the building unlocked and the door to the apartment “slightly open.” Id. at 195. They discovered three teenagers and a baby asleep inside, as well as masks, ammunition, and an unlocked safe in one bedroom. Id. They left the apartment at the request of Ms. Alvarez and waited outside until she arrived home — sometime later — and obtained her written consent to search. Id. This Court concluded that there were exigent circumstances that justified the initial warrant-less entry into the home for a security sweep and that the subsequent search was conducted pursuant to a valid consent. Id. at 200. We noted, however, that the extent of the initial entry that was permissible under the circumstances was dictated by the exigency; “[wjhen the security check has been completed, the area is secured, and there is no longer any danger of the loss or destruction of evidence, the search must cease.” Id. (quoting Jennings, 461 A.2d at 367).
Finally, although State v. Morin, 68 A.3d 61, 64 (R.I.2013), involved a warrant less arrest in the defendant’s home, it was hardly the result of a planned police foray. Rather, an investigator from the Department of Children, Youth, and Families, lawfully on the premises, called the police after the defendant admitted to molesting his stepdaughter. Id. This Court concluded that the statement he gave to police— after receiving the appropriate Miranda warnings, id. — was admissible because the arrest was lawful, based on probable cause and exigent circumstances, that included an enraged wife who was the mother of the child, such that it was reasonable for the officer to believe that his assistance was required at the home, id. at 67.
Consent to Search
Having concluded that there were no exigent circumstances justifying the war-rantless arrest in this case, the exclusionary rule dictates that the evidence- be suppressed. However, it also is necessary to determine whether the search was conducted pursuant to a valid consent executed by defendant or his mother. I conclude that there was no valid consent to search in the circumstances of this case. “The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and ‘[vjoluntariness is a question of fact to be determined from all the circum *1167 stances.’ ” Robinette, 519 U.S. at 40, 117 S.Ct. 417 (quoting Schnecldoth v. Busta-monte, 412 U.S. 218, 248-49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).
Where the validity of a search hinges upon consent, the state must prove by a preponderance of the evidence that the consent indeed was “freely and voluntarily given.” State v. Casas, 900 A.2d 1120, 1134 (R.I.2006) (quoting O’Dell, 576 A.2d at 427). “Consent given during an illegal detention is presumptively invalid.” Id. (quoting United States v. Cellitti, 387 F.3d 618, 622 (7th Cir.2004)). Consent may be deemed valid only if it is “sufficiently attenuated from the illegal police action ‘to dissipate the taint.’” Id. (quoting Wong Sim v. United States, 371 U.S. 471, 487, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). Under these circumstances, it is incumbent upon the state to “demonstrare] that the causal connection between the [consent to search] and the illegal arrest was broken so as to dispel the primary taint of the illegal seizure.” Id. (quoting State v. Burns, 431 A.2d 1199, 1205 (R.I.1981)). Courts first must consider how much time elapsed from the illegal arrest to the time of consent, whether there were any actual, valid intervening circumstances separating the arrest from the consent and then must take a hard look at the “purpose and flagrancy of the official misconduct.” Id. at 1135 (quoting Brown v. Illinois, 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)). “When there is a closé causal connection between the illegal seizure and the [consent], not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but use of the evidence is more likely to compromise the integrity of the courts.” Dunaway v. New York, 442 U.S. 200, 218, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).
In this case, the consent to search obtained from defendant was executed in a parking lot, four-tenths of a mile from his home, while he was seated in the back of a police cruiser. There was no intervening event whatsoever. Further, at least one police officer testified that, although he departed the scene within ten minutes of the arrest, he observed the handgun case being removed from the home. This evidence suggests that defendant was asked to consent to a search and seizure that already had occurred.[15] With respect to the final factor — the purpose of the official misconduct, a warrantless arrest in the home — there is no question that there was probable cause to arrest defendant for a brutal homicide. This factor, however, fails to establish that the consent to search was sufficiently attenuated from his illegal arrest. Cf. O’Dell, 576 A.2d at 427 (search did not violate Fourth Amendment where the defendant’s mother consented to the search of a vacant home and the defendant was arrested pursuant to an arrest warrant).
The same can be said with respect to Cira. It should be noted that there is no claim before us that Cira was without authority to consent to a search of her son’s bedroom. Although Det. Mee testified that defendant was asked to consent to a *1168 search of his bedroom “[b]ecause he ha[d] a reasonable expectation of privacy in his bedroom,” the question of whether his mother also could provide valid consent to search that bedroom has not been raised. See Linde, 876 A.2d at 1125 (Although one who has common authority over the premises to be searched may give valid consent to search, this doctrine “must be applied cautiously to prevent erosion of Fourth Amendment protections.” (quoting State v. Farrell, 443 A.2d 438, 442 (R.I.1982))). Nonetheless, it is incumbent' upon the Court to weigh all of the circumstances surrounding a consent to search by a “careful sifting of the unique facts and circumstances of each case * * * involving consent searches.” Schneckloth, 412 U.S. at 233, 93 S.Ct. 2041.
The facts in this record fail to demonstrate that the state overcame the presumptive invalidity of the consent to search executed by defendant’s mother. This is so because of the temporal proximity of the consent — within moments of her son’s departure in police custody — with several police officers remaining in her home; Cira was described by various witnesses as “crying,” “in shock,” and “nervous.” In addition to the immediacy of the request to consent to the search, there are no intervening circumstances on this record to establish that the consent to search was sufficiently attenuated from the illegal entry into the home as to dissipate the primary taint of the illegal entry. See State v. Paira, 941 A.2d 799, 805 (R.I. 2007); Casas, 900 A.2d at 1135.
Accordingly, the motion to suppress the evidence seized from the defendant’s bedroom should have been granted.
Conclusion
This is a decision that is not lightly undertaken. However, the Fourth Amendment to the United States Constitution is designed to “protect[] people, not places.” Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Accordingly, the exclusionary rule is designed as a prophylactic measure to assure that police officers do not stray from their constitutional boundaries, Johnson, 333 U.S. at 14, 68 S.Ct. 367 particularly within the sanctity of the home, Payton, 445 U.S. at 589-90, 100 S.Ct. 1371. For the reasons set forth herein, I concur in the decision of the majority to vacate the judgment of conviction in this case and to remand this case to the Superior Court.

. To distinguish her from defendant, I refer to Cira Gonzalez by her first name. I intend no disrespect.

. It cannot be said that the seizure of the handgun case falls within the ambit of the plain-view doctrine, because the warrantless entry by the police into defendant’s home was constitutionally impermissible. See Horton v. California, 496 U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) ("It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed.”); State v. Hocken-hull, 525 A.2d 926, 932 (R.I.1987) ("The plain[-]view doctrine is not applicable unless the items seized are evidence of a crime that came into view of an officer lawfully present on the premises searched.”).